No. 28,860.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, et al., *Appellant,* v. W. A. McMAHON et al., *Appellees.*

No. 28,869.

THE STATE OF KANSAS, ex rel. WILLIAM A. SMITH, Attorney-general, et al., *Appellant,* v. O. P. HARCOURT et al., *Appellees.*

(280 Pac. 906.)

Opinion filed October 5, 1929.

*William A. Smith,* attorney-general, and *Roland Boynton,* assistant attorney-general, for the appellant.

*Thomas E. Joyce,* of Kansas City, for the appellees.

The opinion of the court was delivered by

DAWSON, J.: In these actions the state's relator seeks to stamp out the business of usurers who prey on the poorer classes of laboring folk in Wyandotte county. To that end the aid of the injunctive powers of the district court have been invoked. Demurrers to the plaintiff's petitions were sustained, and the state appeals.

The petitions allege that each of defendants keeps a place in Wyandotte county where usurious rates of interest ranging from 240 per cent to 520 per cent per annum are extorted from laboring men whose necessitous circumstances force them to borrow small sums of money. Defendants pretend to take assignments of the weekly or fortnightly wages of these borrowers under colorable sales thereof.

The assignments purport to authorize the borrowers to act as agents of defendants to collect the assigned wages and to bring and deliver the same to defendants. Defendants systematically exact the usurious and grossly extortionate rates of interest above mentioned and thereby manage to keep the borrowers indebted to them for long periods of time. Defendants are enabled to do this because the borrowers are employees of industrial corporations which endeavor to avoid being dragged into court in garnishment and similar proceedings by promulgating and enforcing a rule to the effect that any of their employees whose wages are twice subjected to garnishment will be discharged. Defendants take constant advantage of this rule, and enforce their usurious exactions by threatening the borrowers with garnishment proceedings which would cause the latter to lose their jobs, and the debtors are thereby constrained to submit to whatever usurious and extortionate rates of interest defendants see fit to impose.

Plaintiff's petitions allege:

"That the defendants, in carrying on their said business, purposely select and intend to select poor and necessitous wage earners as their customers, for the purpose of compelling such poor and necessitous wage earners to renew from pay day to pay day and from month to month their excessively usurious loans to the end that such customers when once obtained by said defendants will for a long period of time be compelled to continue to pay the excessively exorbitant, usurious rates of interest hereinabove described.

"That the number of such poor and necessitous wage earners who are now customers of said business so carried on by the defendants numbers into hundreds. The amounts of loans range from $5 to $50, the average loan being about $15. That only the husbands sign said pretended assignments.

"That these wage earners are in almost every instance compelled, through fear of losing their jobs as a result of possible garnishment proceedings threatened or so brought by defendants, to pay and continue to pay such usurious interest and to repeatedly sign such pretended wage assignments.

"That by threatening to garnish, by garnishing, by threatening to serve notice of assignment, and by serving such notices of assignment, the defendants in the conduct of said business, as herein described, greatly and seriously disturb the peace of mind of the numerous poor and necessitous wage earners who deal with them, causing such wage earners to return to the place of business of said defendants and there to pay and to continue to pay such excessively usurious interest on the loans taken by them from pay to pay, and from month to month.

"That the defendants in the conduct of their business illegally and unlawfully interfere with the rights of their customers aforesaid in numerous instances by wrongfully garnishing them and by wrongfully serving notice of pretended assignment of wages upon the employers of such poor and necessitous wage earners, thereby jeopardizing the standing of said wage earners in the eyes of their employers and in some instances causing their discharge

by such manner of conducting their aforesaid business, thereby depriving said customers of their rights to peacefully follow their respective lawful occupations without annoyance or injury thereto or deprivation thereof.

"That as hereinabove set out, said defendants have been carrying on the loan business within the state of Kansas in a manner repugnant to good conscience and good morals and against public policy. That the methods of doing business employed by said defendants are in conflict with the statutes of Kansas regulating the legal rate of interest to be charged by lenders of money, the rate of interest that lenders of money may contract to charge, and the manner of the payment of interest, as set out in R. S. 41-101 to 41-103.

"That said defendants in engaging in the lending of money at extortionate, usurious and unconscionable rates of interest have not only violated all of the principles of good conscience, good morals and public policy, but have engaged in business in direct violation of the provisions of the statutes of Kansas."

Plaintiff's petitions conclude with prayers for temporary and permanent injunctions restraining defendants from loaning money in small sums to laboring men at rates of interest in excess of ten per cent per annum. Plaintiff also prays for a receiver to take charge of the records and papers pertaining to the usurious loans of defendants, and that defendants' usurious loan business be wound up by making the proper credits upon the accounts of the borrowers for all usurious interest exacted and for the liquidation of all such borrowings according to law.

It is a familiar rule of pleading that as against a demurrer all the well-pleaded allegations of a petition are to be liberally construed and accredited as true. Accepting, therefore, the plaintiff's allegations at their face value, the question intrudes: Has the law no adequate preventive for such a deplorable condition of affairs? Counsel for defendants answers with a confident negative. He says there is for each of the hundreds of borrowers a plain and adequate remedy at law, and that the exaction of usurious interest is no concern of third parties, not even of the state itself. Is that so? We have a statute which limits the contract rate of interest to 10 per cent per annum. This statute provides that any person who contracts for a greater rate of interest than 10 per cent per annum shall forfeit the excess; and in addition thereto shall forfeit a sum of money, to be deducted from the amount due for principal and lawful interest, equal to the amount of interest contracted for in excess of ten per cent per annum. (R. S. 41-102.).

But according to plaintiff's allegations, the truth of which is conceded by the demurrers, this statute is systematically set at naught

by the defendants. Between money lender and borrower, of course, it is altogether ineffective until invoked in some lawsuit. And according to the plaintiff's allegations, such a lawsuit will not arise once in every hundred times the usurious toll is taken from the wages of his victim. The wage earner has no time to attend court nor means to employ a lawyer to invoke the defense to the usurer's claim accorded by this statute. He must earn wages every working day to support his family. If garnishment proceedings are instituted which will bring his employer into court on matters of no concern to that employer, the unfortunate debtor is discharged. This dread consequence to the debtor can only be avoided by continued submission to defendants' usurious exactions.

It is undeniable that many an isolated oppression is practiced on a debtor by an exacting creditor for which the law furnishes no practical relief. In the situation portrayed by plaintiff it is perfectly obvious that for the hundreds of indigent debtors held in financial peonage by defendants the remedy supplied by law is pitifully inadequate; and the ruling in *Pritchett v. Mitchell*, 17 Kan. 355, that the exaction of usury is a mere contractual matter of no concern to anybody but the parties themselves is imperatively in need of revision in the light of the complex social and economic conditions brought about by the industrial development in the half century since that doctrine was announced. The long-continued subjection of hundreds of indigent debtors to the usurious exactions of defendants by keeping them in fear of losing their jobs if they should have the temerity to assert the rights accorded them by the beneficent statutes of this commonwealth presents a situation which cannot be tolerated, and one which quite justifies the institution of this litigation by the state itself. In *State, ex rel., v. Howat*, 109 Kan. 376, 198 Pac. 686, where the right of the state to initiate litigation over matters primarily of private concern but secondarily of far-reaching consequence to the public was thoroughly discussed, an excerpt appears from the supreme court of Illinois worth repeating here:

"'It is one of the most useful functions of a court of equity that it may give complete and adequate relief against acts which will constitute nuisances. "'. . . The public authorities have a right to institute the suit where the general public welfare demands it, and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety and welfare is on a plane above mere pecuniary damage although not susceptible of measurement in money, and to say that a court of equity may not

enjoin a public nuisance because property rights are not involved, would be to say that the state is unable to enforce the law or protect its citizens from public wrongs.' (pp. 474-477.)" (pp. 387, 388.)

The same principle was well stated in the case of *In re Debs, Petitioner*, 158 U. S. 564, 39 L. Ed. 1092, where it was said:

"It is obvious from these decisions that while it is not the province of the government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the constitution are intrusted to the care of the nation, and concerning which the nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts, or prevent it from taking measures therein to fully discharge those constitutional duties." (p. 586.)

The courts are not helpless to put a stop to such a nefarious business as that of which plaintiff complains when that business has reached the widespread prevalence it has attained in the principal industrial communities of the state. What in any case is the justification for equitable interference with the multifarious doings of men but the natural reaction of the judicial conscience towards some peculiar evil for which the law by reason of its universality is inadequate to correct? From the foundation of our commonwealth it has been a matter of civic pride that one of this state's primary concerns has been that the poor man shall have a fair chance to better his material condition. To that end we have made the family homestead immune to judicial process *in invitum*. The household goods of the family, the tools of the workman and the needful agricultural chattels of the husbandman are generously exempted from execution sale. (R. S. 60-3501 *et seq.*) So, too, ninety per cent of the current wages of a laborer who is the head of a family are protected from garnishment as prescribed in R. S. 60-3495.

In *Stark v. Bare*, 39 Kan. 100, 17 Pac. 826, it was said:

"The policy of our state is exceedingly liberal in providing protection for the families of indigent debtors. Among other exemptions, it is enacted that the personal earnings of a debtor for three months next preceding the issue of any process against him for the collection of a debt and which earnings are necessary for the support of the debtor's family, are exempt from such process. This provision has been frequently sustained and enforced. We have gone further, and held that where a citizen of this state attempts by a proceeding in attachment or garnishment in another state to subject to the payment of his debt personal earnings of the debtor which under our laws are exempt, and

thus prevent such debtor from availing himself of the benefit of the exemption laws of the state, an action by *injunction* restraining the wrongful action may be maintained by the debtor against such wrongdoer. (*Zimmerman v. Franke,* 34 Kan. 650.)" (p. 103.)

And what are these pretended assignments of the borrowers' wages and the pretended appointments of the borrowers as agents of defendants to receive from the employers the borrowers' wages but an elaborate camouflage through which the wage-exemption statute and the statute prohibiting usury are set at naught? What are these groundless garnishments resorted to and constantly threatened but incidents of a scheme for the circumvention of these laws which the humaneness of our legislature has enacted for the very purpose of protecting the indigent poor from such usurious exactions as those perpetrated by defendants?

Precedents for the particular form of redress sought by plaintiff to suppress the evil complained of are rare, but in *State v. Martin,* 77 N. J. L. 652, 24 L. R. A., n. s., 507, the New Jersey court of errors and appeals went a good deal further than we are asked to do in these cases. It held that although the taking of usurious interest was not a criminal offense in New Jersey, yet interest in excess of six per cent per annum being forbidden under a civil penalty, a loan office where the exaction of such usurious interest was systematically practiced was a disorderly house for the maintenance of which the usurer could be indicted and punished.

In the opinion the court said:

"The title of our statute is 'An act against usury.' (Gen Stat. [1895], p. 3703.) The provision of its first section is 'that no person or corporation shall, upon contract, take directly or indirectly, for loan of any money, wares, merchandise, goods and chattels, above the value of $6 for the forbearance of $100 for a year, and after that rate for a greater or less sum or for longer or shorter time.' The object disclosed in the title of the act is the prevention of usury; the method by which the legislature provides for the carrying of that object into effect is by enacting an express prohibition against taking it. Counsel argues that a violation of this mandate of the statute by a person loaning money does not constitute an unlawful act, first, for the reason that the statute imposes no penalty upon him for so doing. . . .

"The statement that the statute does not impose any penalty upon a person who takes usury is not accurate; for the second section of the act deprives him of the power to enforce the payment of any interest on his loan, and entitles the borrower to have the amount of the usury deducted from the principal of the loan in case usury has been paid. . . . The fact that the statute imposes no penalty, except the deprivation of the money which the

statute prohibits the lender from taking, affords no ground for holding that the taking of usury is not unlawful." (p. 654.)

The Kansas statute (R. S. 41-101 *et seq.*) was enacted under a title: "An act regulating the rate of interest upon money, *prohibiting usury, and providing penalties therefor*," etc. The specific penalties provided for the breach of our statute read:

"That any person so contracting for a greater rate of interest than ten per cent per annum shall forfeit all interest so contracted for in excess of such ten per cent.; and in addition thereto shall forfeit a sum of money, to be deducted from the amount due for principal and lawful interest, equal to the amount of interest contracted for in excess of ten per cent per annum." (Laws 1889, ch. 164, § 2, R. S. 41-102.)

"All. payments of money or property made by way of usurious interest or of inducement to contract for more than ten per cent per annum, whether made in advance or not, shall be deemed and taken to be payments made on account of the principal and ten per cent interest per annum, and the courts shall render judgment for no greater sum than the balance found due after deducting the payments of money or property made as aforesaid: *Provided,* That no *bona fide* indorsee of negotiable paper purchased before due shall be affected by any usury exacted by any former holder of such paper, unless he shall have actual notice of the usury previous to his purchase. But double the amount of such excess, incorporated into negotiable paper, may, in such cases, after payment, be recovered back by action against the party originally exacting the usury, in any court of competent jurisdiction." (Laws 1889, ch. 164, § 3, R. S. 41-103.)

It will thus be seen that the exaction of usurious interest has been denounced as unlawful and penalized by our legislature although it is not one of the specific offenses enumerated in our crimes act. It is not only illegal, but it is a grievous antisocial iniquity (*Marshall v. Beeler,* 104 Kan. 32, 178 Pac. 245), and when its practice assumes the proportions and prevalence alleged by the plaintiff a court of equity should not hesitate to suppress it.

We note that the eminent court of appeals in Kentucky, in *Commonwealth v. Mutual L. & T. Co.,* 156 Ky. 299, 50 L. R. A., n. s., 1171, found itself unable to follow the precedent of the New Jersey court of errors and appeals quoted above, but it distinguished the case it had to consider from the New Jersey case thus:

"Sections 2218 and 2219 of the Kentucky statutes provide that 6 per cent shall be the legal rate of interest in this state, and that all contracts for loans at a greater rate shall be void to the extent of the excess over the legal rate; but there is no statute in this state prescribing a penalty for exacting or contracting for a usurious rate of interest. It certainly cannot be contrary to law,

in the ordinary sense, to do a thing for which the law prescribes no penalty. . . .

"Under our statute it is therefore not contrary to law, in the sense that a penalty is prescribed for its infraction, to maintain a place where money is habitually loaned at usurious rates, but is contrary to law only in the sense that such contracts are unenforceable to the extent of the usury contracted for. Our statute is directed only to the preservation of the rights of individuals by providing that such contracts shall be unenforceable, while the New Jersey statute in addition provides a punishment by way of forfeiture of all interest." (p. 300.)

The logic of the Kentucky case clearly puts this state in line with New Jersey. The Kansas statute does prohibit usury and does prescribe penalties (civil penalties inuring to the debtor), and the practice of usury being unlawful in this state, upon sufficient aggravation it may be suppressed by injunction.

The judgment of the district court is reversed and the cause remanded for further proceedings.