178 So. 231

**TRY–ME BOTTLING CO. et al. v. STATE.**

6 Div. 155.

Supreme Court of Alabama.

Jan. 13, 1938.

Lange, Simpson & Brantley, Coleman, Spain, Stewart & Davies, and Jos. S. Mead, all of Birmingham, for appellants.

A. A. Carmichael, Atty. Gen., Wm. S. Pritchard, Special Asst. Atty. Gen., and Winston B. McCall, of Birmingham, for the State.

GARDNER, Justice.

The bill is filed by the State seeking injunctive relief against defendants charged with conducting, in connection with their legitimate soft drink business, a lottery or gift enterprise in the nature of a lottery in disregard of the laws of this State.

Defendants insist the suit was brought in the name of the State without proper authority therefor, and much argument is directed to that question.

Some of the cases cited by defendants (People v. General Electric Co. et al., 172 Ill. 129, 50 N.E. 158; Kenney v. Consumers' Gas Co., 142 Mass. 417, 8 N.E. 138; State ex rel. Wilson v. Shively, 10 Or. 267) disclose these courts were interested to know that the suit was not one in which the State merely permitted the use of its name, "or invidiously assume[s] and champion[s] the cause of one private citizen against another for the purpose of settling rights or titles in controversy between them, when each and all citizens are equally entitled to its protection." Other authorities (United States v. Throckmorton, 98 U.S. 61, 71, 25 L.Ed. 93; State v. Gattavara, 182 Wash. 325, 47 P.2d 18) were similar to our own of Ex parte State, State v. Stephenson, 113 Ala. 85, 21 So. 210, to the effect that judicial proceedings in the name of the State should be by the Attorney General of the State, and not other officers. But technical refinement is not indulged.

 As said in the Throckmorton Case, supra: "It is essential, therefore, to such a suit, that without special regard to form, but in some way which the court can recognize, it should appear the the Attorney-General has brought it himself, or given such order for its institution as will make him officially responsible for it, and show his control of the cause."

In the instant case all of this was thoroughly reviewed before the chancellor. The name of the Attorney General of the State is signed to this bill. Special counsel employed consulted the Attorney General and correspondence ensued. Both the Attorney General and the Governor fully

understood the nature of the suit, and it is undisputed that the name of the Attorney General was signed to the bill by special counsel upon the express direction of the Attorney General. And under the express language of section 854, Code of 1923, the Attorney General could independently have instituted this litigation. Montgomery v. Sparks, 225 Ala. 343, 142 So. 769.

It is clear enough from the proof the Governor in his letter to counsel intended no instruction as to any particular method of procedure; but, in view of the right of the Attorney General to independently bring the suit, no further consideration need be given this phase of the argument.

And we think it is also clear the suit is brought by the State in good faith with the full co-operation of the Governor and the Attorney General, 'and in what they conceived for the best interests of the whole people of the State.

True, some of defendants' competitors were interested sufficiently as to employ special counsel, but this does not in any manner seriously affect the good faith of the proceedings by the State, and is a mere incident thereto. And, out of abundance of caution it seems, this special counsel has been duly appointed an assistant to the Attorney General. But enough has been said to show our view the court correctly ruled in declining to abate or dismiss the suit or dissolve the temporary restraining order on account of any of these matters discussed.

Coming to the merits of the case little need be said.

Defendants, in order to advertise and stimulate business, put into practice the following, as described by the corporation president and manager:

"Q. Now, Mr. Teaver, I will ask you whether or not you at any time inaugurated a practice of putting crowns on any of the bottles of this beverage, underneath which crown there was a number, and I would like for you to explain to the court when that was and exactly what you did. A. On July the 31st; I think it was the 29th or 31st, last year—

"Q. That was 1936? A. That was 1936. We started what we called our premium advertising. On that basis we put in with the crowns that we put on the bottles; we put in a certain number of crowns that contained underneath the cork a stamped figure five and marked five cents and then we put some crowns of the same type marked ten cents and some crowns of the same type marked twenty-five cents and some crowns of the same type marked fifty .cents and some crowns of the same type marked one dollar.

"Q. Now these were blown into the cap? A. That was printed in black type underneath the cork on the tin plate that the top was made from."

His further testimony discloses that there was invested an average of $15 to each 100 cases of the soft drink that was being sold, or 15 cents a case; a purchaser of the bottled drink takes the crown, lifts the cork, and looks for the number; if a "lucky" number, it is redeemable in cash by the dealer, and defendant corporation reimburses the dealer. It may be 5 cents or as much as a dollar; but any member of the public who finds one of these crowns with the. "lucky" number may also receive the cash it represents in the same manner, as the manager states "lots of them are picked up by kids * * * thrown out in the trash, and kids pick them up lots of times." No skill is required, the "lucky" number determines the value.

The question of what constitutes a lottery or gift enterprise in the nature of a lottery has been here recently considered in Grimes v. State, Ala.Sup., 178 So. 73, and needs no reiteration.

■ Under that authority, there can be no doubt that defendants' advertising scheme comes within the definition of a lottery as therein set forth, and therefore runs counter to our constitutional and statutory provision for the suppression of lotteries and gambling devices generally. Section 65, Constitution 1901;. Section 4247, Code of 1923; Gen.Acts 1931, p. 806.

■ Our decisions recognize the general rule that courts of equity have no jurisdiction to enjoin the commission of offenses against the criminal laws of the State. Pike County Dispensary v. Mayor, etc., Brundidge, 130 Ala. 193, 30 So. 451.

■ On the other hand, if the facts presented disclose the need of equity intervention for the protection of rights cognizable by equity, then injunctive relief may be granted, though as an incident thereto the writ may also restrain the commission of a crime. Or, as otherwise stated, equity will not withhold the remedy of injunctive relief merely because the acts constituting

a nuisance are also of a criminal nature. Numerous illustrative cases are noted in the annotations found in 40 A.L.R. p. 1145 et seq.; 91 A.L.R. p. 316 et seq. Some authorities have persistently held to the view that equity will grant injunctive relief only when property rights are involved, but this court long since repudiated any such theory as wholly unsound. State v. Ellis, 201 Ala. 295, 78 So. 71, L.R.A.1918D, 816, and authorities therein cited, including that of Stead v. Fortner, 255 Ill. 468, 99 N.E. 680, 684, wherein was the following language here pertinent: "The maintenance of the public health, morals, safety, and welfare is on a plane above mere pecuniary damage, although not susceptible of measurement in money, and to say that a court of equity may not enjoin a public nuisance because property rights are not involved would be to say that the state is unable to enforce the law or protect its citizens from public wrongs."

■ The bill, therefore, rests 'for its equity upon the well-recognized and ancient jurisdiction of equity courts to restrain by injunction public nuisances. Ridge v. State, 206 Ala. 349, 89 So. 742; State v. Ellis, 201'Ala. 295, 78 So. 71, 72, L.R.A. 1918D, 816.

But defendants insist there is no public nuisance shown, and that at most only a violation of the criminal statute is involved. We cannot agree. The device under the cap of the bottle is for convenience referred to in the argument as the "flicker device," and, as previously observed, they are so distributed as to average 15 cents a case. It is an advertising scheme, as more fully indicated by the following handbills distributed to the public by defendants:

"Notice.

It pays to Drink
Dixi-Cola
A Most Invigorating Beverage

Made from
Pure Harmless Ingredients
////////////
Only 5¢

"Many Dixi-Cola Crowns Are Valuable
Some are worth .05
Some are worth .10
Some are worth .25
Some are worth .50
Some are worth 1.00

Always Look under The Cork in Dixi-Cola
Crowns for Premiums
(Trade Mark)
(Exhibit "B")
Watch for
Valuable Bottle Tops
Whenever you see a Bottle Top
Stop and Examine It
If it's a Dixi-Cola Top, lift Cork with the blade of your knife, look for imprint on tin under cork.
Lots of These Crowns are Valuable
Drink
Dixi-Cola
Trade Mark
'The talk of the Town'
And remember you always get Your
Moneys worth and more when
Buying Dixi-Cola

Then too, like rare specimens of coin many Dixi-Cola Crowns are valuable. Some worth 5¢ each, some 10¢, some 25¢, some 50¢ and some $1.00.

All crowns of value are Imprinted
underneath the cork.

It's lots of fun and profitable too, to look for these rare

Dixi-Cola Specimens."

■ According to the marking of the "flicker," any one finding these bottle caps or crowns may be entitled to receive from 5 cents to $1. Of course, the larger number have no such marking. And, as we have observed, children often find these crowns in trash piles, and it is quite evident they are widely distributed over the State. These "flicker devices" are manufactured at defendant's plant. Perhaps the language of section 4281, Code of 1923, may not be interpreted so as to include the "flicker device" here involved, though it may tend in some degree to demonstrate the legislative mind as to those places where gambling devices are kept, and denominate them common nuisances. But such a device is clearly embraced in the broad and comprehensive language of the Act "To Suppress The Evils of Gambling Devices" of July 1931, General Acts 1931, p. 806, with, perhaps, particular reference to subdivision (h) of section 1, page 807: "Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, intended for the purpose of winning money or any other thing by chance or hazard."

■ And being thus embraced within the influence of this act, these "flicker devices,".

manufactured at defendant's plant, are unlawfully in defendants' possession and subject to seizure (section 5 of the act, p. 808) and condemnation, forfeiture, and destruction (sections 6 and 9 of the act, pp. 808, 809) under decree of a court of equity. Their possession is under section 4, p. 807, also made a misdemeanor.

And under section 4247, Code of 1923, any person who conducts a lottery or any gift enterprise or scheme in the nature of a lottery is likewise guilty of a misdemeanor.

■ Statutes of this character were passed in obedience to the mandate of section 65 of our Constitution, which expressly denies to the Legislature any power to authorize lotteries, and directs the passage of laws "to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery." In this State, therefore, the public policy is emphatically declared against lotteries or any scheme in the nature of a lottery, both by Constitution and by statutes.

The attitude of this State in reference to such practices was well expressed by this court in Johnson v. State, 83 Ala. 65, 3 So. 790, 791, in the following language: "This construction is in full harmony with the policy of the constitution and laws of Alabama prohibitory of the vicious system of lottery schemes and the evil practice of gaming, in all their protean shapes, tending, as centuries of human experience now fully attest, to mendicancy and idleness on the one hand, and moral profligacy and debauchery on the other. No state has more steadfastly emphasized its disapprobation of all these gambling devices of money-making by resort to schemes of chance than Alabama. For more than 40 years past—we may say, from the organization of the state, with some few years of experimental leniency—the voice of the legislature has been loud and earnest in its condemnation of these immoral practices, now deemed so enervating to the public morals."

True, the lawmaking body has not in so many words declared the use of such devices a nuisance, but it is our view that in substance and effect this has been done.

We have said these "flicker devices" come within the condemnation of the 1931 act and their possession unlawful. They can be used for no lawful purpose, and are scattered unlawfully throughout defendants' trade territory.

In Lee v. City of Birmingham, 223 Ala. 196, 135 So. 314, 315, speaking to a like question, this court observed that "it is held by respectable authority that, if a gambling device is prohibited by statute, its operation may be considered a nuisance, and abated upon proper proceedings."

And in Mullen & Co. v. Moseley, 13 Idaho 457, 90 P. 986, 990, 12 L.R.A., N.S., 394, 121 Am.St.Rep. 277, 13 Ann.Cas. 450, (cited in the Lee Case, supra), the court said: "It has been urged by counsel for appellants that, in order to authorize the destruction of these machines, it was necessary for the Legislature to declare them a nuisance. The Legislature has in effect done so. It has prohibited their use in any manner or form, and has also directed that, when any such instruments are found within this state, they shall be seized and destroyed. Making their use a crime and rendering them incapable of any legitimate use reduces them to the condition and state of a public nuisance which they clearly are. This amounts as effectually to declaring them a nuisance as if the word 'nuisance' itself had been used in the Statute."

■ The mere prosecution for a misdemeanor here involved will not give complete relief. The State is interested in the welfare of the people within her domain, and, of consequence, in the enforcement of the declared public policy against lotteries or gift schemes in the nature thereof. And, as said by the Illinois court, Stead v. Fortner, 255 Ill. 468, 99 N.E. 680, here approvingly quoted in State v. Ellis, supra: "As we have noted above, this court has never regarded a criminal prosecution, which can only dispose of an existing nuisance and cannot prevent a renewal of the nuisance, for which a new prosecution must be brought, as a complete and adequate remedy for a wrong inflicted upon the public. The public authorities have a right to institute the suit where the general public welfare demands it and damages to the public are not susceptible of computation. The maintenance of the public health, morals, safety, and welfare is on a plane above mere pecuniary damage, although not susceptible of measurement in money; and to say that a court of equity may not enjoin a public nuisance because property rights are not involved would be to say that the state is unable to enforce the law or protect its citizens from public wrongs."

■ And, as observed by this court in the Ellis Case, supra, "whether the mainte-

nance of a public nuisance is or is not punishable in the law courts as a crime is an immaterial incident so far as the preventive jurisdiction of equity is concerned; for equity ignores its criminality, and visits upon the offender no punishment as for a crime."

The Pike County Dispensary Case, supra, upon which defendants lay some stress, involved no question of public nuisance. At that time there had been no such declared policy as presented in the instant case concerning lotteries. The education and interest of the public in the evils there involved were gradual, and became later crystallized into definite statutes on the subject. As we stated in the beginning, that case is authority only against equity jurisdiction for prevention of crime, and nothing more.

The conclusion is that the bill has equity for the abatement of a public nuisance. Its averments are in all material respects admitted to be true, and the testimony of the defendant manager and president of the corporation supports the same. The Attorney General was well within his authority, and likewise the Governor, in lending his support.

It results, therefore, as our view, that the chancellor correctly ruled in all respects, and his decrees are accordingly here affirmed.

Affirmed.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.