9 So.2d 134

**STATE ex rel. EMBRY, Solicitor, v. BYNUM et al.**

**7 Div. 677.**

Supreme Court of Alabama.

May 14, 1942.

Rehearing Denied June 30, 1942.

McCord, Miller & McCord, of Gadsden, and Wilkinson & Skinner, of Birmingham, for appellees.

Thos. S. Lawson, Atty. Gen., and Jas. F. Matthews, Asst. Atty. Gen., for appellant.

Lawrence Dumas, Jr., T. Julian Skinner, Jr., B. A. Monaghan, and Douglas Arant, all of Birmingham, amici curiae in support of the appeal.

BROWN, Justice.

This is a bill filed by the State of Alabama on the relation of the Solicitor of the

Sixteenth Judicial Circuit, in pursuance of the recommendation of the grand jury of St. Clair County and an order of one of the circuit judges of said Circuit, and as last amended, against J. B. Bynum doing business as Security Credit Company, Joe Ruffin doing business as Personal Finance Company and A. C. Blount doing business as Security Loan Company, to enjoin and restrain said defendants from conducting their short loan or "loan shark" business in defiance of the law, and to the common nuisance and hurt of the citizens of Gadsden, Etowah County, and the industrial community thereof.

The act alleged to be applicable and controlling is the local act, as originally enacted, applicable to the counties of Jefferson, Walker, Morgan and Etowah Counties, approved March 9, 1901, Acts 1900–1901, pp. 2685–2688. The demurrer filed by said Bynum on December 18, 1940, was overruled.

On August 22, 1941, the said Bynum filed another demurrer to the bill, assigning as grounds of demurrer:

"(1) For that the proceedings maintained in this cause is not the proper legal remedy to obtain the relief sought for.

"(2) For that the Acts of the Legislature of Alabama, 1900–1901 as set forth and mentioned in the original bill of complaint affords a legel and complete and adequate remedy at law for the complainant in this cause."

On submission on that demurrer, the circuit court, in equity sitting, entered the following decree: "This cause was submitted at the present term on the Demurrer of Respondent J. B. Bynum doing business as Security Credit Company to the Original Bill of Complaint filed, August 23, 1941 and on consideration it is adjudged, ordered and decreed that Demurrer of said Respondent to said Original Bill is well taken for the reason that there is a *full, adequate and complete remedy at law for complainant*. The trouble would appear to be that no law, however framed, can protect a person from himself. The legal remedy is adequate and complete, if individuals will claim its protection and cease being particeps criminis in a species of robbery. Accordingly said demurrers filed August 23, 1941, are hereby sustained separately and severally as to each phase or aspect of said Bill of Complaint." [Italics supplied.]

From said decree the State appeals, and is now, acting through and by the Attorney General, insisting that said decree is erroneous and should be reversed.

Before entering upon a discussion of the merits of the bill as against the stated ground of demurrer, we notice the question suggested by appellee in brief, though not raised by the demurrer, that the act of 1901, on which the bill is rested, was repealed by § 19 of Act No. 339, approved November 9, 1932, Acts 1932, Extra Session pp. 331, 334. Said Section 19 is in the following words:

"This act is intended as an entire revision of the subject matter of loans of one hundred dollars or less in all counties of the State of Alabama, having a population of two hundred thousand or more, according to the last or any subsequent Federal census, and all laws and parts of laws, local, general or special, in conflict or inconsistent with the provisions of this act be and the same are hereby repealed." Acts 1932 Extra Session, p. 334.

The act of 1932 was passed as a general law applicable to "all counties of the State of Alabama, having a population of two hundred thousand or more, according to the last or any subsequent Federal census." The county of Etowah, according to the Federal census of 1930, had a total population of 63,399, and according to the census of 1940, 72,580.

This act did not expressly, or necessarily by implication, repeal the local law of 1901 as to Etowah County. Nor was said local law repealed by the act approved August 11, 1927, as to Etowah County, though it did as to the county of Morgan which had only a population of 40,196, and the 1927 repealing act was limited as to counties having a population of 45,000 or less. Acts 1927, Regular Session, p. 270.

The local act, to state its provisions pertinent to this case briefly, provides that all persons engaged in the business of money brokers or loaning money and taking as security therefor bills of sale, mortgages, conveyances or liens of any kind on personal property, or personal effects or other personal security in Etowah County, shall when such loan is made express in the instrument securing the same the rate of interest at which such loan is made, the date of said loan, the fact that said instrument is taken for a loan of money, a minute description of the property securing the

loan, and if on household goods, from whom purchased, the date when said loan is due, and shall within five days thereof file the said instrument for record in the office of the Judge of Probate of the county in which the property or instrument securing the loan is situated. That the Judge of Probate shall record the same and take the regular fee therefor, and that such recordation shall be notice of said loan. And when payments are made on said loan, whether principal or interest a receipt therefor shall be given the borrower by the lender expressing the actual amount so paid. And when a greater rate of interest than 12% per annum is charged or reserved on said loan and the payments made thereon amount to as much as the principle sum loaned, together with 8% per annum, it shall be unlawful to enforce, or attempt to enforce, the security taken for said loan and said security shall be deemed discharged by said payments.

That when any such loan is made within the influence of said act, a copy of the instrument securing said loan shall be furnished to the borrower, and when the instrument securing the loan is signed by mark, the signature thereto must be attested by two witnesses who are not of kin or in the employment of the lender, and who in no way are interested in the transaction.

That individuals engaged in such business are prohibited from using the word "Company," or its abbreviation "Co.", in the name under which they do business, and if such persons be a partnership or corporation such partnership shall file with the Probate Judge a sworn statement showing the place of business of such partnership or corporation, the amount of the capital invested, and the names of the partners or officers and directors of such corporation, as the case may be.

All contracts made in violation of the act are void. The business of banking and loans made pursuant of such business is excepted when the loan exceeds $75.

The act further provides that no commission or charge for negotiating or making the loan or investigating the title of the property covered by the instrument securing the loan shall be made, and no attorney's fee shall be taxed or charged against the borrower, exceeding 10% of the original loan.

The act makes it a misdemeanor for any person to take or attempt to take property covered by such alleged lien, except by legal process. Acts 1900–1901, pp. 2685–2688.

The bill avers that each of said individuals is engaged in the business of money brokers or lenders of money for themselves or others on bill of sale, notes or mortgages on personal property, or other personal effects, and have been so engaged for more than twelve months immediately before the filing of the bill, and are using the names as above stated in connection with their business.

"That each of said respondents have in the conduct and pursuit of their respective businesses in said County during the twelve months next preceding the filing of this petition, and are now, deliberately, persistently and continuously engaged in open and flagrant violations of the provisions of said act; among which violations are: That in said County and during said period of time, said respondents while so engaged in such business as money brokers or loaning money and taking security therefor, by bills of sale, mortgages on or conveyances or liens on personal property or personal effects or other security have failed and are deliberately and continuously failing to express in the instrument securing such respective loans, the rate of interest at which such respective loans are made, the date of such respective loans; the fact that such respective instruments are taken for loans of money; a minute description of the property securing the loan; the date when loans are due; and have persistently and continuously failed and refused within five days thereof to file the said instrument for record in the office of the Judge of Probate of said County. That in making each of said respective loans in said County and during said period of time each of said respondents have charged or reserved and are now continuously charging or reserving high and usurious rates of interest, which said rate of interest so charged or reserved is greatly in excess of any amount authorized by law to be charged, exacted or reserved for making such loans. That in making each of said loans as aforesaid, the respondents have pursued the deliberate policy of failing or refusing to furnish the borrower a copy of the particular instrument securing such respective loans. And petitioner further avers that none of said respondents are engaged in the business of banking and that none of the loans here

142

referred to exceeds the sum of Seventy-five ($75.00) Dollars."

"Your petitioner further shows that the borrowers of such money from the said respondents as hereinbefore outlined are people of limited means and education and who are not advised of their legal rights and who are unable to employ counsel to represent and protect their respective interests in any actions or proceedings which the respondents may institute in the Courts of this State for the purpose of attempting to collect money under such invalid contracts. And the petitioner further shows to your Honors that notwithstanding the fact that such contracts for such loans of money as aforesaid are void, invalid and unenforceable; and that the said respondents have no right to enter the Courts of this State for the purpose of attempting to collect any money on account of such contracts, nevertheless, the respondents have continuously, openly and advisedly abused and prostituted the process of the Courts of Etowah County in filing large numbers of suits in such Courts against the particular and respective borrowers in which particular suits so filed the respondents attempt to enforce said respective contracts against the particular party so sued, and that in pursuance of such policy and scheme of said respondents so to use the Courts of said County many hundred of suits, to-wit: about 500 suits have been so filed in that said Courts of said County, seeking to enforce collection of money claimed under such invalid contracts during said period; that the parties so sued by respondents are largely ignorant and not advised of their legal rights and not able to employ counsel to represent them, and on account of the failure of the defendants to comply with the provisions of said Act are unable to furnish the proof necessary to support the proper defense to such actions, and such violations of the law are not shown on the face of the instruments sued on; that by reason of their ignorance and their lack of knowledge of their legal rights and of their inability to employ counsel, said parties so sued in a greater number of cases allow judgments by default to be rendered in such actions; that in and by such judgments in addition to obtaining a judgment for money to which they have no legal right in and by such suits, the respondents obtain judgment for additional large amounts as attorney's fees together with the court costs accruing in such actions, none of which the respondents have the legal rights to recover; that almost invariably the parties so proceeded against are wage earners employed by divers persons, firms and corporations as laborers in said County; and that upon obtaining such judgments the respondents institute writs of garnishment directed to the employer of the persons against whom such judgment has been so recovered for the purpose of reaching money due such person for wages, and that as a result thereof due to the wholesale and extended scheme of said respondents, great expenses, trouble and confusion has been caused and is being caused to be suffered by such employers in the answer to said writs of garnishment and proceedings thereon. Your petitioner further shows that in a large number of cases by some arrangement or understanding between the Justices of the Peace and/or constables or other officers issuing and/or serving such writs of garnishment a sum of money called a fee of about $3.00 in each instance is extorted from the person against whom such judgment has been so obtained and whose earnings are thus intercepted in order to obtain a release from such garnishment, which said amount so extorted is without any authority of law and is in effect a sale of justice by the officers connected with such courts. Your petitioner further charges that the institution of said suits and such writs of garnishment and the amount of court costs thereby collected exacted and extorted has been, is now, and will continue to be, if the respondents be permitted to continue their policy and course, the source of great revenue to the Justices of the Peace and other officers connected with such Courts of said County in which such actions are so instituted by the respondents; and that the constant and continuous maintenance of such actions on such invalid contracts in said Court tends to corrupt the due and legal administration of justice in such courts; and that the dockets of said courts have been clogged and will continue to be clogged to such an extent that the trial and disposition of legal or meritorious business in such court has been, is, and will continue to be seriously impaired."

"Your petitioner further charges that the violations of said Act hereinbefore shown and the institution of said suits and garnishments and the exaction of such fees

for the release of such garnishments, by separate respondents against separate parties has all been done in pursuance of a common scheme, plan, and arrangement between all of said respondents to carry out their individual or corporate purpose of violating said Act as aforesaid and of using the Court of said County in the effort to collect money on account of such invalid contracts; and that such actions of said respondents so made in concert and in pursuance of a common scheme, conspiracy or undertaking tends to bring the law into the contempt of the public and to make ridiculous the administration of justice in said County."

"Your petitioner further charges that the State of Alabama in its Sovereign capacity is interested in the protection of its citizens, particularly small wage earners, from invasions of their legal rights and from the illegal exaction or extortion of monies which such citizens are not legally required to pay. And that said State is also interested in preserving the Courts of said County from corruption and abuse of their processes on the part of said respondents in their attempt to use such courts in the wholesale manner aforesaid for the purpose of collecting money under such invalid contracts which is not legally collectible; and said State is also interested that the Courts of said County be so conducted that the trial and disposition of legal and meritorious matters coming before said Courts be not impeded or hampered, and that the said practices of said respondents be effectually restrained."

"Your petitioner further charges that the respondents, separately and by confederation with one another will continue to violate the provisions of said Act in the manner aforesaid, and will continue to exact large sums of money as usurious interest, and will continue to institute large numbers of vexations and illegal actions in the Courts of Etowah County for the purpose of attempting to enforce such invalid and void contracts so entered into, and that the process of said courts will continue to be abused by such actions and garnishments so instituted by respondents, unless restrained therefrom by order, judgment or decree of this Honorable Court."

"Complainant charges and states the facts to be true that these respondents in order to conduct their said businesses of lending money as above set out and as a precedent therefor, and as required by law applied for and received a franchise, privilege or license from the State of Alabama and that by reason of the granting of said franchise, privilege or license to do business these respondents have become obligated to conform, in all respects, to the provisions of law governing such business of lending money in said County; and complainant further charges and states the facts to be true that these respondents, under the averments of this bill, have failed or refused to comply with said law."

The bill prays that all contracts taken and held by said defendants in violation of said act be declared null and void and that each be restrained and enjoined from enforcing or attempting to enforce the same, and that they and their agents and servants be enjoined and restrained from further carrying on and prosecution of their said business, in violation of said Act of 1901, and for general relief.

The consideration and application of said local act was before this court in the case of Gibbs-Hargrave Shoe Co. et al. v. Peek, 212 Ala. 633, 103 So. 672, 673, where it was observed:

"The act is aimed at the business of that class of money brokers or lenders commonly known as 'loan sharks,' whose favorite waters are the habitat of needy and untutored wage-earners.

"The language of the statute indicates a studied intent to make it broadly inclusive to prevent evasion, and become effective as a police measure to suppress the evil. In keeping with this purpose, we hold that the word 'note,' as used in the title and body of the act, has its usual meaning and includes promissory notes given as security or evidence of the debt. The case here furnishes a fair illustration of the reason for general terms. The plaintiff speaks of the papers signed by him as notes, but it is clear enough they were assignments of his wages as security for loans in fact, but having a concluding clause, declaring the transaction an 'absolute purchase' of wages, and disclaiming a loan; this, perhaps, to give the transaction such form as to bring it within the rule of Max J. Winkler Brokerage Co. v. Darby, 167 Ala. 223, 52 So. 23.

"The record discloses the carrying on of such business in spite of the statute, the lender charging and collecting, for the use of the money [$50.00], 20 per cent. of the amount of the loan at the end of every two weeks, or, as found by the trial court, at

the rate of 520 per cent. per annum," and on which the lender during a period of 312 weeks, collected $1560.00 in interest, and the borrower was still charged with the principal loan $50.00.

■ The public policy of this State condemns usurious contracts as "tainted with an evil * * * intent" Barclift v. Fields, 145 Ala. 264, 41 So. 84, 85 and "offensive to the policy and positive mandate of the law." Hawkins v. Pearson, 96 Ala. 369, 11 So. 304; McCormick v. Fallier et al., 223 Ala. 80, 134 So. 471. This public policy is supported by Divine Authority, Exodus, Ch. 22, V. 25, and the common law. We quote 66 C.J. p. 142, § 5: " 'It seems that the taking of interest for the loan of money, or at least taking excessive interest, has been regarded with abhorrence from the earliest times. We are told that such usury was prohibited by the early laws of the Chinese and Hindus, and by the Koran. The Mosaic law prohibited the jews from exacting interest on loans to their brethern, but permitted interest to be taken from Gentiles. Among the Athenians moderate interest charges were allowed, but custom fixed the maximum rate at twelve per cent, and anyone exacting a higher rate was looked on with contempt as being vile and ignominious. Among the Romans interest charges were limited by the Twelve Tables, and subsequently totally abolished. Commercial necessity revived the practice of making loans at interest, which were, however, strictly regulated by later legislation. During the Middle Ages the people of England and especially the English church entertained the opinion then current in Europe that the taking of any interest for the loan of money was a detestable vice, hateful to man and contrary to the laws of God. It is said that not only was the usurer liable during his life to the censures of the church, but after his death his chattels were forfeited to the king, and his lands escheated to lord of the fee. Contracts for interest not exceeding ten per cent were expressly legalized by act of parliament in 1545; but it was also provided that a contract for a loan at a rate of interest in excess of ten per cent should be wholly void both as to principal and interest.'"

In "Law and Contemporary Problems" published by Duke University, School of Law, Vol. VIII, 1941, No. 1, in an article by Emmet R. Field, LL.B, University of Louisville, we take the following:

"Loan sharks are not usually imbued with respect for law. Evasion of the various legal controls is indispensable to the success of their enterprises, and, operating as they do outside the law, they inevitably acquire a contempt for that which they have profitably defied by means of their various stratagems. The lawless attitude of those engaging in loan shark enterprises is a foremost reason why the loan shark continues to thrive and the problem he creates remains a serious one, despite a marked increase in recent years in the number and scope of regulatory laws relating to the field of consumer lending.

"Everywhere the baneful effects of usury are recognized, and in every jurisdiction the state has undertaken to prescribe some measure of protection for its people from the harsh results arising from unconscionable exactions for the use of money. Experience has demonstrated that legislation unaccompanied by vigorous and continuous policing action is not enough. The inherent limitations of criminal prosecutions necessitate the use of other weapons, and in a substantial number of jurisdictions the exaction of usury is not a crime and resort to the criminal law is not there available. The illegal lender's methods are designed to place the borrower in a position where he cannot make use of ordinary remedies the legal machinery available to the borrower is often too cumbersome, expensive and otherwise inaccessible, and the prosecution of actions by individual victims seeking redress has nowhere seriously retarded the loan shark's vicious practices. The victims themselves are usually uninformed persons who are incapable of defending their own interest or even of affording the time and money necessary for the litigation attendant upon a defense, while the lenders with whom they deal invariably possess resources and employ methods far beyond the power of their victims to oppose. The enormous aggregate operations of loan sharks, their disregard and planned circumvention of private rights, their calculated and defiant contempt for law, their brazen use of minor courts as weapons of oppression, and the devastating effects of their piratical onslaught upon millions of obscure people clearly provide a problem of general concern and one which defies solution by unorganized, individual attacks.

"From these conditions the state itself emerges as the logical champion of its own

unfortunate citizens who are the actual and potential victims of loan sharks. In championing them the state, in a number of jurisdictions, has sought to eliminate the operation of illegal lending enterprises by resort to the equitable remedies of injunction and receivership. In the interesting litigation ensuing some conflict between traditional views limiting the scope of these remedies and the necessity for an expansive application of them to the changed conditions and new problems engendered by our complex and ruthless modern era is apparent. The expansive attributes of equity are nowhere more strikingly described than in the old English case of Taylor v. Salmon, wherein Lord Chancellor Cottingham stated that, 'It is the duty of a court of equity, in common with all courts and all institutions, to adapt its course of proceedings as far as possible to the needs of the existing state of society, and to apply its jurisdiction to all those new cases which, from the progress daily making in the affairs of men, must continuously arise, and not, from too strict adherence to forms and rules established under very different circumstances, decline to administer justice to enforce rights for which there is no other remedy.' The basic jurisdiction of equity, the position of the state in relation to the public welfare, and the consequent relation of the courts to the state were clearly illustrated by the Supreme Court of the United States in In re Debs [158 U.S. 564, 15 S.Ct. 900, 906, 39 L.Ed. 1092], wherein the court announced that 'Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligations which it is under to promote the interest of all and to prevent the wrongdoing of one, resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court.'

"While the invocation of the remedy of injunction by the state in loan-shark cases is a relatively untested procedure, the ingenuity of lenders and their counsel has failed to evolve any convincing defensive argument based on the novelty of the situation and the defenses usually urged are venerable ones which have been repeatedly presented in injunction cases of all types; i. e., the lack of sufficient standing and interest of the petitioner to warrant the granting of the relief prayed, the existence of adequate remedies at law, the supposed inability of courts of equity to enjoin criminal acts, the absence of property rights resting in the state, and the absence of facts characterizing the lender's activities as a nuisance. The existence of the necessary public interest is customarily recognized where the state sues to protect its own interest as a juristic person, but such recognition is not so readily afforded where it sues in vindication of the social interests of the community at large, and it is in this latter field that loan shark cases lie.

"Although the question is seldom elucidated, the issue in most cases is not whether the court has jurisdiction to grant an injunction but whether within the very broad limits of its jurisdictional powers it should as a matter of discretion do so, and the motivations of policy and expediency which influence one chancellor will be wholly without appeal to another. It appears, however, that whenever the court is made to feel that the continuing unlawful acts constitute a direct threat to some recognized and important common interest, such acts will be enjoined. Courts may well differ in their views upon what constitutes a threat or an injury to the public good and upon what methods are the most adequate in affording protection; but when the decision is once made, the remedy is not to be blocked by outmoded principles of validity which arose in other settings, and the more courageous and enlightened courts have frankly taken such a stand. Their opinions are not always free from references to venerable doctrines, superimposed in support of the decision, but the principle of direct action is boldly employed with effective results. It is not accurate to consider that the doctrine of the equitable prevention of public wrongs extends the jurisdiction of equity. Rather does it demonstrate the inherently expansive quality of that jurisdiction which permits adaption of its remedies to the changing needs of society and enables equity to perform its mission.

"The first case in which the right of the state to injunctive relief against the unlawful acts of loan sharks was established was State v. McMahon [128 Kan. 772, 280

P. 906, 66 A.L.R. 1072], decided in Kansas in 1929. The public wrong arose in the fact that the defendant's business was the exaction of exorbitantly usurious and illegal rates of interest from numerous small wage earners, while the injury to the public welfare lay in the further fact that these exactions had reduced hundreds of these needy victims to financial peonage. The contention that the borrower's individual civil remedies afforded them adequate remedy at law was rejected, inasmuch as only in rare instances were the borrowers in a sufficiently strong economic position to enable them to effectively insist upon their individual rights. While it was not so stated, this fact clearly intensified the element of public wrong, in that conditions created and methods pursued by the lender tended largely to deprive borrowers of the equal protection of the laws. The court based its decision upon the principle expressed in the Debs case, and while finding that the acts complained of constituted a public nuisance, the issuance of an injunction was predicated upon a recognition that the injury to social and economic welfare constituted its own justification for injunctive protection."

In concluding his article Mr. Field observes: "In suppressing the evil, injunction and receivership are not the only weapons available, but they are among the most deadly." State of Kansas ex rel. v. McMahon et al., 128 Kan. 772, 280 P. 906, 66 A.L.R. 1072.

The doctrine of the cited case has been reaffirmed in State of Kansas ex rel. Beck v. Basham, 146 Kan. 181, 70 P.2d 24, in an able opinion by Mr. Justice Harvey. The right of the state to injunctions to protect its established public policy is sustained in Commonwealth v. Continental Co., 275 Ky. 238, 121 S.W.2d 49; State v. Gillian, 141 Fla. 707, 193 So. 751; State ex rel. Goff v. O'Neil, 205 Minn. 366, 286 N.W. 316, and in principle by our case Try-Me Bottling Co. et al. v. State, 235 Ala. 207, 178 So. 231.

■ The allegations of the bill show— and they must be taken as true on demurrer —that the dockets of the law courts are incumbered with suits on said unlawful loan contracts; apparently valid on their face, in such sort as to obstruct the administration of justice, that the victims are helpless in the hand of the defendants, and can not defend against said suits; that unlawful fees for costs are being added

through the connivance and cupidity of inferior courts or officers and exhorbitant and unlawful attorney's fees added to the burdens of the victims of said "racket."

■ Our conclusion, therefore, is that the state in pursuance of its established public policy in protecting the interest of its indigent and helpless citizens against the ravages of the loan shark pest, the economic prosperity of its industrial areas, the furtherance of the public faith in the integrity and impartiality of its law courts, in the administration of justice therein, may invoke the aid of its courts of equity to enjoin the unlawful practices of the defendants as a public nuisance, restrain and enjoin them from proceeding in the law courts to enforce said void contracts, and keep them in subjugation to the law.

The bill is not without equity, nor was it subject to the specific grounds of demurrer.

Reversed and remanded.

All Justices concur, except KNIGHT, J., not sitting.

### On Rehearing.

BROWN, Justice.

The appellee, relying on a dictum in Howard v. State ex rel. Andrews, Solicitor, 238 Ala. 185, 190 So. 278 [opinion by the writer], now insists that the bill is wholly without equity, because it was not filed by or joined in by the Attorney General.

This question was not raised on the submission of this appeal made on motion of the Attorney General and supported by him by brief and argument. True the defendants demurred to the bill on the ground that the solicitor was without authority to file same and the demurrer was overruled, but there is no appeal from that decree, and no cross-assignment of error by the demurrant, on this appeal.

The equity of the bill was sustained in Howard v. State ex rel. Andrews, supra, but in the dictum it was stated: "Such bill [to enjoin a common law public nuisance] can only be entertained when it is filed by the State *on the relation of the Attorney General,* or by a private individual in his own name who suffers special injury or damage different in kind from that suffered by the public generally." 238 Ala. 186, 190 So. 279. The point at issue *is the necessity of the proceeding being instituted by the Attorney General as relator and representative of the State.* [Italics supplied.]

In proceedings before this court "for remedial writs to correct errors intervening, or supposed to have intervened, in the course of the proceedings of inferior courts *in the exercise* of criminal jurisdiction," it has been held: "Such application must be made in the name of the state, and must be made by and through the attorney general." Ex parte State of Alabama (In re Stephenson), 113 Ala. 85, 21 So. 210. [Italics supplied.]

In that case it was said:

"The petition addressed to the court in this case has a caption preceding the address: 'Ex parte the State of Alabama, In Re Noah Stephenson.' In the body of the petition the state is not nominated as a party, and it is signed by the solicitor for the county of Montgomery. The motion entered on the docket, reads: 'Comes Tennent Lomax, solicitor,' etc., 'who prosecutes for the state of Alabama,'—and is signed by the solicitor. A statutory duty of the attorney general is to 'attend on the part of the state, to all criminal cases pending in the supreme court, and to all civil cases in which the state is a party in the same court.' Code [of 1886], § 127. It is manifest that this tribunal can recognize no other representative of the state than the attorney general. Whether the state has an interest in the vacation of the order made in a criminal case by a court of competent jurisdiction, or whether there shall be a prohibition of the exercise of jurisdiction, or any other remedial writ prosecuted by the state,—at all times a matter of more or less gravity,—the law commits to the judgment and discretion of the attorney general, and when he proceeds he must proceed in the name of the state.

"Whether there be any merit in the present application is not a question for consideration. It will be time enough to consider and decide it when presented properly by proper authority. The petition and motion are overruled."

In another case of like character as the case just cited, an application by the State, on the relation of the circuit and county solicitor, to the circuit court, as the opinion states, "for a mandamus to Hon. Robt. I. Burke, judge of the county court of Cullman county, to compel the said judge of the county court to reinstate upon the docket of the county court· * * * divers criminal causes for violation of the prohibition laws of this state, particularly mentioned in the petition for mandamus, which are alleged to have been unlawfully nol. pros'd by the said county court, without the consent or request of the circuit or the county solicitor, and over their protest, and to compel the said judge to proceed with the trial of said causes." [160 Ala. 163, 48 So. 1036]. In responding to the insistence that in such proceedings, the circuit and county solicitor were without authority to proceed in the name of the State, the Justice speaking, observed:

"It is not only unnecessary, but improper, for us on this appeal to pass upon the merits of the petition or the assignments of error. We know of no law authorizing the solicitor, or any other person or officer, other than the Attorney General of the state, to institute *a proceeding like this*, in the name or on the relation of the state, or in his own name." [Italics supplied.]

The bill filed in this case is not an application for a remedial writ, such as mandamus, or prohibition, sometimes referred to as prerogative writs, to review, reverse or restrain the action of an inferior court of criminal jurisdiction, as Ex parte State of Alabama (In re Stephenson), supra, and State ex rel. Almon et al. v. Burke, Judge, 160 Ala. 163, 48 So. 1035, hence the following observation in State ex rel. Almon, et al. v. Burke, Judge, supra, is here applicable to said decisions, we quote: "While the case of Benners v. State, 124 Ala. 97, 26 So. 942, does decide that solicitors, being the prosecuting officers of the state, are proper relators in the bringing of an application for mandamus, that opinion, like all others, must, of course, be limited to the case under consideration." 160 Ala. 167, 48 So. 1036.

As observed in the opinion of May 14, 1942: "This is a bill filed by the State of Alabama on the relation of the Solicitor of the Sixteenth Judicial Circuit, in pursuance of the recommendation of the grand jury of St. Clair County and an order of one of the circuit judges of said Circuit." Some of the facts confronting these officers of the State are, we may assume, stated in the bill, and others of which the courts take judicial knowledge are stated in brief filed "amicus curiae."

"A review of the Tables of Bankruptcy Statistics for the fiscal year ending June 30, 1941, prepared by the Administrative Office of the United States Courts in accordance with Section 53 of the Bankruptcy Act [11 U.S.C.A. § 81], is inform-

ative in this connection. In the first place, 75% of all wage-earner bankruptcies in the entire United States and its possessions arise in the Northern District of Alabama. (Bankruptcy Statistics, supra, Table 1) That fact alone is almost incomprehensible. But there is much worse: the staggering truth is that 90% of the bankruptcy matters concluded during the fiscal year 1941 in that District were no-asset cases (Bankruptcy Statistics, supra, Table 8) The wage-earner's financial experience, in other words, is more generally disasterous in Northern Alabama than in any other section of the country.

"And it is undeniable that this black picture is due in large part to the depredations of small loan operators: the estimated debt of Alabama wage-earners to such operators at the close of 1939 was $3,000,000, or $4.03 for every urban resident of this State. As the average rate of interest charged on such loans is greater than 240%, the wage-earners of this State were milked, in 1939 alone, of more than $7,200,000 in purported interest which they were under no obligation to pay. (See Terrell, Illegal Lending in Alabama (1941) pp. 61–64). The fantastic number of wage-earner bankruptcies in this District is not, then, inexplicable—it is due in large measure to the small loan operators."

In the face of these circumstances was the circuit solicitor powerless? He is expressly authorized by the statute to "prosecute and defend any civil action in the circuit court in the prosecution or defense of which the state is interested." Code of 1940, Title 13, § 229.

It was expressly held in Benners v. State, 124 Ala. 97, 101, 102, 26 So. 942, 943: "The solicitor, as the prosecuting officer of the state, was a proper relator in bringing the application for mandamus before the criminal court." The criminal court of Jefferson County was a court of equal dignity with the circuit court in the trial of all criminal offenses.

In Montgomery, Superintendent of Banks, v. Sparks, Tax Collector, 225 Ala. 343, 346, 142 So. 769, a bill in equity to enforce the State's prerogative right of preference, the bill was filed in the name and behalf of the State by "A. L. Hardegree solicitor of the 18th Judicial Circuit," and neither the solicitor nor the Attorney-

General was named as relator or otherwise made a party. The solicitor testified in his depositions as a witness, that he was verbally directed by the Attorney-General to bring the proceedings. The court, the Justices voting six to one, sustained the proceeding against a dissenting opinion rested on Ex parte State of Alabama (In re Stephenson), and State ex rel. Almon et al. v. Burke, Judge. See, Montgomery, Superintendent of Banks v. Sparks, Tax Collector, supra.

Here the Attorney-General has not only submitted the case on the assignments of error and supported the same by brief but is now resisting the application for rehearing. This is sufficient to show that he is controlling the litigation, and that is all that is required. Try-Me Bottling Co. et al. v. State, 235 Ala. 207, 178 So. 231; State ex rel. Goff County Atty. v. O'Neil, 205 Minn. 366, 286 N.W. 316. In the O'Neil case last cited, it was observed: "In this court on this appeal the attorney general has come in and filed a supplemental brief with the county attorney. There can be no doubt of the attorney general's power to step into a cause where the state is a party and take over or carry on the same regardless of the fact that it had been instituted by the county attorney on behalf of the state." 286 N.W. 318.

The want of authority of the solicitor to proceed in the name of the state in the circuit court can not be raised by demurrer, but should, if questioned, be raised by motion as required by § 48, Title 46, Code of 1940, and in the absence of such motion his authority will be presumed. Doe ex dem. Chamberlain, Miller & Co. v. Abbott et al., 152 Ala. 243, 44 So. 637, 126 Am.St.Rep. 30; Mitchell v. Church of Christ at Mt. Olive, 219 Ala. 322, 122 So. 341.

We are of opinion that the attorney-general by his official acts in this case has ratified the filing of the bill, and is conducting the litigation for and in behalf of the state.

The dictum in Howard v. State, ex rel. Andrews, Solicitor, supra, that a bill filed by the solicitor was without equity, is disapproved, and the application for rehearing in this case is overruled.

All Justices concur, except KNIGHT, J., not sitting.