Members of the Senate Alabama State House Montgomery, Alabama 36104
Dear Senators:
We have received Senate Resolution No. 63, by which you request our opinion on the constitutionality of House Bill No. 160, a bill now pending before the legislature.
Senate Resolution No. 63 reads as follows:
 "BE IT RESOLVED BY THE SENATE OF THE LEGISLATURE OF ALABAMA, That we respectfully request the Honorable Chief Justice and Associate Justices of the Supreme Court, or a majority of them, to give this body their written opinion on certain important constitutional questions relating to House Bill 160 (the 'Bill') that is now pending before the House of Representatives and is expected to be considered by the Senate in due course, a copy of which bill accompanies this resolution and is made a part hereof by reference. As a basis for the questions with respect to the Bill posed by this resolution, the Senate understands as follows:
 "(i) As an exception to the general laws of the state prohibiting gambling (Code of Alabama 1975, Tit. 13A, Chap. 12, [Art.] 2), the Legislature has reserved the right to authorize pari-mutuel wagering on horse or greyhound racing in such locations as may be provided by statute (Code of Alabama 1975, § 13A-12-31).
 "(ii) Section 65 of the Constitution of Alabama of 1901, prohibits the Legislature from enacting laws that authorize lotteries or gift enterprises or schemes in the nature of a lottery.
 "(iii) In Opinion of the Justices [No. 205], 287 Ala. 334, 251 So.2d 751 (1971), a majority of the Justices of the Supreme Court, in considering whether Section 65 of the Constitution would be violated by the enactment of two bills proposing to authorize pari-mutuel wagering on greyhound racing, expressed the following opinions: (a) the Constitution prevents the Legislature from authorizing a lottery, but it does not prevent the Legislature from authorizing forms of gambling that do not constitute a lottery; (b) since the outcome of a horse or dog race is not determined only by chance, a significant degree of skill is involved in a successful bet on the winning race contestant; and (c) while the amounts won by the winners of a pari-mutuel pool depend upon the participation of other bettors, that factor does not cause the pool to be a lottery because the pari-mutuel system does not determine the winning bettors but only the amounts won by such bettors.
 "(iv) In reliance upon the aforesaid Opinion of the Justices [No. 205], statutes have been enacted which authorize pari-mutuel wagering on horse racing or greyhound racing at four racetracks now existing in the state.
 "The Bill, if enacted into law, would permit any racetrack in the state, whether such racetrack is now existing or may be hereafter established, to conduct skill dependent wagering games ('skill dependent games') for profit through the use of video display electronic equipment ('permitted *Page 109 
equipment'). The Bill defines a skill dependent game as follows:
 "Any game of chance played by human players on permitted equipment for money or any other form of value in which the outcome of such game, as measured over multiple plays, can be affected by the human players' application of the principles of probability to the rules of such games and the manner in which the equipment is programmed to play such game.
 "Permitted equipment is defined in the Bill as follows:
 "Any video display electronic device (EXCLUDING ANY SLOT MACHINE) (i) which, within any given time frame, is used to play a skill dependent game, (ii) which can be played upon payment of a consideration, and (iii) which, by reason of the skill of the player or players and the element of chance, may entitle the player or players to receive a payoff, whether automatically from such equipment or in any other manner.
 "The Bill does not identify any particular game that is to be considered a skill dependent game, nor does it identify any particular kind of permitted equipment that may be used to play skill dependent games.
 "While not identifying the specific kinds of permitted equipment to be authorized for skill dependent games at racetracks, the Bill, in Section 4(c) thereof, expresses the Legislature's intent to authorize the use of every kind of video display wagering equipment generically described by the Bill, whether now in existence or becoming available in the future. The Legislature further expresses its intent that the act proposed by the Bill is to be given effect if a single type of permitted equipment, among the variety generically authorized by the Bill, is determined to provide a game that does not constitute a lottery by reason of the degree of player's skill involved in such game or as the result of other conditions relating to the use of such equipment.
 "This resolution should not be construed as requesting the Justices of the Supreme Court to express any opinion on whether any particular item of permitted equipment reflects the rules of any particular game and involves the skill of the player in such manner as will prevent the game, as played on that equipment, from being considered a lottery or gambling by lot. It is recognized that such a question could only be definitively answered by raising the question in a litigated case and presenting the record of that case to the Supreme Court for appellate review.
 "Based on the foregoing, the Senate of Alabama presents the following constitutional questions concerning the effect of Section 65 of the Constitution on the Bill:
 "(1) Can the Bill authorize gambling at racetracks in a form other than pari-mutuel wagering on racing without violating Section 65, provided that the form of gambling so authorized involves a sufficient degree of skill on the part of the player as to prevent such gambling from being a lottery or gambling by lot?
 "(2) Recognizing that the outcome of a bet on a horse or greyhound race depends upon both chance and the effect of objective factors (e.g., the breeding and performance record of the racing contestants) anticipated by a skilled bettor, can the involvement of significant player's skill in the manner contemplated by the Bill, when such skill influences the outcome of a game also influenced by chance, prevent such game, as a matter of law, from being gambling by lot in violation of Section 65?
 "(3) Recognizing that the individual bettors on racing vary greatly in their knowledge of the racing contestants and their ability to apply their knowledge for predictive purposes, can differences in skill among individual players be disregarded in determining, as a matter of law, whether the skill dependent games authorized by the Bill constitute gambling by lot in violation of Section 65?
 "(4) Can a player's knowledge and skillful use of the relative values of the possible hands of the game of poker and the relative probabilities of such hands being dealt influence the outcome of poker to such degree as will prevent such game, as a matter of law, from being gambling by lot *Page 110 
in violation of Section 65 of the Constitution?
 "(5) If the game of poker is influenced by the skill of the player to such extent that it does not constitute gambling by lot, can the Bill lawfully authorize the use of permitted equipment to play the game of poker if such equipment is designed and programmed to reflect correctly the rules of poker and the relative values and probabilities of the possible hands in poker?
 "RESOLVED FURTHER, That the Secretary of the Senate is hereby directed to send nine true copies of this resolution, together with copies of the pending Bill, to the Clerk of the Supreme Court of Alabama, and to transmit this request to the Justices of the Supreme Court forthwith upon adoption of this resolution."
In essence, Senate Resolution No. 63 seeks this Court's opinion as to the scope of § 65 of the Alabama Constitution, which provides:
 "The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided."
(Emphasis added.)
We preface our discussion of the scope of § 65 by advising, as we have often advised in the past, that the procedure by which this Court renders advisory opinions is fraught with difficulty. One of the problems is that "the opportunity is not generally available for opposing [persons] to present their respective positions." Opinion of the Justices No. 280,417 So.2d 936, 936 (Ala. 1981). Another difficulty results from the fact that the requests come to us without a body of "pertinent facts . . . as is usual in the adversary nature of our judicial system." Id. "[E]xpressions of opinions, hastily and abstractly considered, may well pose a greater danger of confusion and uncertainty than the exercise of judicial restraint in declining to respond to the questions submitted." Id. at 937. For these reasons, "the opinions of the individual Justices, promulgated under § 12-2-10, Code of Alabama 1975, are not . . . binding." 417 So.2d at 937. See also Opinion of theJustices No. 338, 624 So.2d 107 (Ala. 1993); Opinion of theJustices No. 214, 294 Ala. 589, 319 So.2d 715 (1975).
The abstractions with which we are often confronted when we consider requests for advisory opinions are particularly prominent in this request, inasmuch as Resolution No. 63 is not "requesting . . . any opinion on whether any particular item of permitted equipment reflects the rules of any particular game." (Emphasis added.) In other words, we are asked to consider the scope of § 65 in purely hypothetical contexts — even in the context of devices that may not currently exist. With these cautionary remarks, we offer the following observations on § 65 and H.B. 160.
Section 65 does not prohibit the legislature from authorizinggambling. Opinion of the Justices No. 205, 287 Ala. 334, 335,251 So.2d 751, 753 (1971). It does, not, for example, forbid the legislature from authorizing pari-mutuel betting on horse races, Opinion of the Justices No. 260, 373 So.2d 278
(Ala. 1979); or dog races, Opinion of the Justices No. 205,287 Ala. at 336, 251 So.2d at 754. Section 65 "merely says that the legislature shall not authorize a lottery." Id. at 335, 251 So.2d at 753 (emphasis added). Therefore, our discussion necessarily focuses on the definition of that term.
A "lottery," as we have defined that term, contains the following three elements: " '(1) [a] prize, (2) awarded by chance, (3) for a consideration.' " Id. (quoting Grimes v.State, 235 Ala. 192, 178 So. 73 (1937)). Senate Resolution No. 63 requires us to consider the relationship between chance and skill as bearing on the second element.
As to this relationship, "[l]ot has been correctly defined to be 'a contrivance to determine a question by chance, orwithout the action of man's choice or will.' " Loiseau v.State, 114 Ala. 34, 38, 22 So. 138, 139 (1897) (emphasis added). In other words, when "the result of winning is to be determined by *Page 111 
the use of a contrivance of chance, in which neither choice norskill can exert any effect, it is gambling by lot, or a prohibited lottery." Id. at 38, 22 So. at 139 (emphasis added). In Opinion of the Justices No. 83, 249 Ala. 516, 31 So.2d 753
(1947), Justice Lawson, in a special opinion, offered the following additional comments:
 "In a lottery the winner is determined by lot. Lot or chance is the determining factor and a participant has no opportunity to materially exercise his reason, judgment, sagacity, or discretion. In a horse race the winner is not determined by chance alone, as the condition, speed, and endurance of the horse and the skill and management of the rider are factors affecting the result of the race. The better has the opportunity to exercise his judgment and discretion in determining the horse on which to bet. The pari-mutuel method or system of betting on a horse race . . . does not affect or determine the result of the race. . . . The fact that a better cannot determine the exact amount of money he may win at the time he places his bet because the odds may change during the course of betting on a race does not make the betting a mere game of chance, since the better can exercise his reason, judgment, and discretion, in selecting the horse he thinks will win. Horse racing, like foot races, boat races, football, and baseball, is a game in which the skill and judgment of man enter into the outcome to a marked degree and is not a game where chance is the dominant factor."
249 Ala. at 524, 31 So.2d at 761 (Lawson, J., writing specially and declining to express an opinion) (emphasis added).
In Opinion of the Justices No. 83 Justice Livingston, also writing specially, explained the relationship between chance and skill as follows: " 'Chance, as one of the elements of a lottery, has reference to the attempt to attain certain ends, not by skill or any known or fixed rules, but by the happening of a subsequent event, incapable of ascertainment oraccomplishment by means of human foresight or ingenuity.' "249 Ala. at 525, 31 So.2d at 762 (quoting an American Jurisprudence
annotation (emphasis added)). " 'If merit or skill play anypart in determining the distribution,' " he continued, " 'there is no lottery.' " Id. (further quoting the annotation; emphasis added).
Although the views of Justices Lawson and Livingston expressed in their special writings in Opinion No. 83 — that pari-mutuel wagering was not gambling by lot — were not then shared by a majority of this Court, their views were accepted by a majority in Opinion of the Justices No. 205, 287 Ala. 334,335, 251 So.2d 751, 753 (1971). Expressing the opinion that pari-mutuel wagering on dog races was not a prohibited activity, the Court there stated: "No useful purpose would be served by any further elaborations of Justice Lawson's full discussion of the questions involved which would seem to dictate the conclusion reached by him. We are in full accord with the views expressed by Justice Lawson." Id. at 335, 251 So.2d at 753.
From the opinion of Justice Lawson and Justice Livingston we understand that "skill" — in the context of activities that may be prohibited by § 65 — is merely the exercise, upon known rules and fixed probabilities, of "sagacity," which is defined as "quickness or acuteness of sense perceptions; keenness of discernment or penetration with soundness of judgment; shrewdness; [the] ability to see what is relevant and significant." Webster's New International Dictionary 2198 (2d ed. (Unabridged) 1953). Thus, an activity that results in an award based upon the exercise of these qualities in conjunction with definite rules and probabilities that can be learned and calculated by the bettor is not prohibited by § 65. It is in this context that we now address the specific questions in Senate Resolution No. 63.
Question one asks whether the Bill can "authorize gambling at racetracks in a form other than pari-mutuel wagering on racing without violating [§] 65, [if] the form of gambling so authorized involves a sufficient degree of skill on the part of the player as to prevent such gambling from being a lottery or gambling by lot." (Emphasis added.) This question is posed as though the skills required to operate the contemplated gambling devices would fall on a "spectrum," or a sliding scale, somewhere between the *Page 112 
skills required for "pari-mutuel wagering" and the no skills required for "gambling by lot," and it further is posed as though the answer would vary, depending on the level of skill involved.
In our view, this is the wrong inquiry. The Bill, itself, provides:
 "Section 8. Racing Commission Powers. Each racing commission, in addition to the powers that it has under its governing racing act with respect to pari-mutuel racing, shall have the same powers to license, regulate and supervise the conduct of skill dependent games for profit through the use of permitted equipment as it has to license, regulate and supervise racing activities and pari-mutuel wagering thereon. . . ."
(Emphasis added.) The Bill defines a "skill dependent game" as "[a]ny game of chance played . . . on permitted equipment . . . in which the outcome . . ., as measured over multiple plays, can be affected by the human players' application of theprinciples of probability to the rules of such games and the manner in which the equipment is programmed to play such game." (Emphasis added.) Significantly, the Bill then adds: "Under nocircumstances shall the playing of a slot machine be considereda skill dependent game." (Emphasis added.) It defines "permitted equipment" as equipment that combines "the skill ofthe player . . . and the element of chance." The purpose of this language is, as we understand it, to draw a sharpdistinction between the type of gambling proposed by the Bill and the type prohibited by the constitution.
As we have come to understand the scope of § 65 since Opinionof the Justices No. 205, 287 Ala. 334, 251 So.2d 751 (1971), we think it is the exercise of some degree of skill that is thesine qua non of compliance with the constitution. Regardless, therefore, of the way question one is posed, we need not speculate on the skills required to operate specific devices, or on where those skills might fall on the above-mentioned spectrum. This is so, because the proposed gambling devices, bydefinition, require some degree of skill. For these reasons, the devices differ qualitatively — not merely quantitatively — from the essentially mindless operation of a handle on a slot machine. In other words, as long as some degree of skill is required in a gambling activity, that activity differs from a lottery in kind, rather than in degree. In such a case, the issue is not the degree of skill involved, but whether some
skill is involved. Therefore, even though question one seems to focus on degrees of skill, we can, and do, confidently answer it in the affirmative.
Questions two and three are very similar. They ask:
 "(2) Recognizing that the outcome of a bet on a . . . race depends upon both chance and the effect of objective factors . . . anticipated by a skilled bettor, can the involvement of significant player's skill in the manner contemplated by the Bill, when such skill influences the outcome of a game also influenced by chance, prevent such game, as a matter of law, from being gambling by lot in violation of Section 65?
 "(3) Recognizing that the individual bettors on racing vary greatly in their knowledge of the racing contestants and their ability to apply their knowledge for predictive purposes, can differences in skill among individual players be disregarded in determining, as a matter of law, whether the skill dependent games authorized by the Bill constitute gambling by lot in violation of Section 65?"
(Emphasis added.)
We are uncertain as to what is here requested. We find particularly puzzling the use in both questions of the phrase "as a matter of law." Certainly, we understand its meaning in the contexts with which we are familiar. Given the way it is used in this context, however, we are uncertain as to what is intended, and we do not wish to speculate. At any rate, our discussion of question one should prove useful to the legislature in its consideration of questions two and three. For these reasons, we decline to answer questions two and three.
We also decline to answer question four. It asks:
 "Can a player's knowledge and skillful use of the relative values of the possible *Page 113 
hands of the game of poker and the relative probabilities of such hands being dealt influence the outcome of poker to such degree as will prevent such game, as a matter of law, from being gambling by lot in violation of Section 65 of the Constitution?"
Question four not only suffers the same infirmity that we observed in questions two and three, but it alsoincorrectly assumes that the members of this Court are all familiar with the rules of the game of poker. Under these conditions, any response we could make as to question four would be speculative at best.
Question five stands on slightly better ground. It asks:
 "(5) If the game of poker is influenced by the skill of the player to such extent that it does not constitute gambling by lot, can the Bill lawfully authorize the use of permitted equipment to play the game of poker if such equipment is designed and programmed to reflect correctly the rules of poker and the relative values and probabilities of the possible hands in poker?"
Question five thus asks us to assume that the game of poker is influenced by the skill of the player. Assuming, without deciding, that this is true, we must answer question five in the affirmative, based on our response to question one. Again, we point out that the relevant inquiry should not be whatdegree of skill is involved in the operation of a "poker device," but whether skill is involved.
In sum, we answer questions one and five in the affirmative and decline to answer questions two, three, and four.
Respectfully submitted,
 PERRY O. HOOPER, Sr. Chief Justice
RENEAU P. ALMON
JANIE L. SHORES
J. GORMAN HOUSTON, Jr.
MARK KENNEDY
RALPH D. COOK
 TERRY BUTTS Associate Justices
It is my view that a game played upon payment of a consideration must involve a material exercise of skill if it is to avoid the proscription on lotteries imposed by Article IV, § 65, of the Constitution of Alabama of 1901. Section 65 provides:
 "The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided."
(Emphasis added.) A "lottery" is a game for consideration in which a prize is awarded by chance. Opinion of the Justices No.205, 287 Ala. 334, 251 So.2d 751 (1971) (citing Grimes v.State, 235 Ala. 192, 178 So. 73 (1937)). A game of chance implies the lack of a skill component. Id. The question, of course, becomes: "How significant must the skill component of a game be for the game to avoid being classified as a lottery?" I agree with those Justices signing the main opinion that this is essentially a qualitative, instead of a quantitative, inquiry and that no bright line separates permissible from impermissible degrees of skill. I do not agree with the other Justices' conclusion, however, that a game for consideration is constitutionally permissible as long as merely "some skill is involved." 692 So.2d at 112 (emphasis in original).
As today's main opinion correctly points out, in Opinion ofthe Justices No. 205, 287 Ala. at 335, 251 So.2d at 753, a majority of the Justices adopted Justice Lawson's prior opinion that in a lottery "a participant has no opportunity tomaterially exercise his reason, judgment, sagacity, or discretion." (Citing Opinion of the Justices No. 83, 249 Ala. 516,524, 31 So.2d 753, 761 (1947) (Lawson, J.) (emphasis added)). A majority of the Justices in Opinion of the JusticesNo. 205, supra, did not, however, adopt the earlier opinion of Justice Livingston, which included the statement, quoted in today's main opinion, *Page 114 
that "[i]f merit or skill play any part in determining the distribution, there is no lottery," Opinion of the Justices No.83, 249 Ala. at 525, 31 So.2d at 762 (Livingston, J.) (quoting 34 Am.Jur. p. 649, § 6) (emphasis added in today's main opinion). Justice Livingston's opinion, which was separate and distinct from Justice Lawson's opinion, was not joined by any other Justice. In fact, Justice Livingston merely quoted, but did not apply, the "any part" language from the AmericanJurisprudence article. 249 Ala. at 525, 31 So.2d at 762
(Livingston, J.). Until today, no Justice of the Alabama Supreme Court has elevated the American Jurisprudence quotation to constitutional status.[1]
The difference between the "material exercise" test of Justice Lawson and the previously unadopted "any part" language quoted by Justice Livingston may seem subtle in the abstract, but it could be dramatic in the context of an actual controversy. Although a standard slot machine would easily fail both tests, see Opinion of the Justices No. 205,287 Ala. at 335, 251 So.2d at 753, a game simulating a roulette wheel, if labelled a "skill dependent game," and if it allowed the bettor to start and stop the wheel, might pass the "any part" test, but would probably fail the "material exercise" test. See id.
(stating that a roulette wheel, like a slot machine, does not involve a skill component and thus constitutes an impermissible lottery) (quoting Utah State Fair Ass'n v. Green, 68 Utah 251,249 P. 1016, 1030 (1926) (Straup, J., concurring)).
A constitutional provision should be interpreted to give it a "fair and legitimate" meaning. Lockridge v. Adrian,638 So.2d 766, 768 (Ala. 1994) (quoting Steele v. County Commissioners,83 Ala. 304, 305, 3 So. 761, 762 (1888)). The "any part" (arguably, de minimis) test eviscerates § 65 and denies it a fair and legitimate meaning. Section 65 should be interpreted to require that a game for consideration possess a material skill component, that is, a genuinely significant and meaningful skill component, to avoid being classified as a lottery.
Although I express no opinion on the wisdom of the Legislature's authorizing gambling in any form, I would provide a nonbinding[2] affirmative answer to the questions posed by Senate Resolution No. 63 with respect to House Bill No. 160. If the particular facts of a case establish that a "skill dependent game" authorized by House Bill No. 160 generally involves the material exercise of a player's skill, then the game would not be a proscribed lottery under § 65 of the Constitution of Alabama of 1901.
[1] In fact, in Minges v. City of Birmingham, 251 Ala. 65, 69,36 So.2d 93, 96 (1948), Justice Livingston, writing for this Court in an actual case, provided a more complete quote of the relevant passage from American Jurisprudence, as follows:
 "Under the English rule, a lottery consists in the distribution of money or other property by chance, and nothing but chance, that is, by doing that which is equivalent to drawing lots. If merit or skill play any part
in determining the distribution, there is no lottery. . . . In the United States, however, by what appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; that is sufficient if chance is the dominant or controlling factor. However, the rule that chance must be the dominant factor is to be taken in the qualitative or causative sense, rather than the quantitative sense."
(Quoting 34 Am.Jur. p. 649, § 6) (emphasis added). Thus, it appears that neither Justice Livingston nor the authors of theAmerican Jurisprudence article would apply the English "any part" test to determine whether a game for consideration is a "lottery" in the United States.
[2] See Opinions of the Justices, 209 Ala. 593, 594, 96 So. 487,489 (1923) (stating that advisory opinions are opinions of the individual Justices, not judgments of the Supreme Court, and are thus "nonjudicial" and "nonbinding").