*631 Members of the House of Representatives
Alabama State House
Montgomery, Alabama
Dear Representatives:
We have received House Resolution No. 251 requesting the opinions of the Justices of the Supreme Court as to whether Senate Bill No. 257 (“S.B. 257”), now pending' before the Legislature, is a revenue-raising measure that should originate in the House of Representatives, pursuant to § 70 of the Constitution of Alabama of 1901. Your synopsis of S.B. 257 states:
“This bill would provide that bona fide coin-operated amusement machines shall not be subject to the criminal prohibition against possessing gambling devices; would amend the exemption *632 of racing facilities from existing gambling laws in order to accommodate other licensed wagering activities at such facilities; would authorize each racing commission in the state to license each racing facility under its jurisdiction to conduct skill dependent wagering games and prescribe the terms and conditions of such license; would confer upon each racing commission, in addition to the powers that it has to license and regulate racing and pari-mutuel wagering thereon, the same or similar powers to license and regulate the conduct of skill dependent wagering games; would exempt skill dependent wagering games from the prohibitions of certain criminal and civil statutes and provide that certain acts related to skill dependent wagering games shall constitute crimes; and would levy certain state and local license taxes on the conduct of skill.”
Since the adoption of Ala. Code 1975, § 12-2-10, authorizing the Justices of this Court to issue advisory opinions when requested by the Governor or either house of the Legislature, the Justices of this Court have consistently restricted their opinions to questions concerning the constitutionality of pending legislation under specific provisions of the Alabama Constitution or the United States Constitution. Opinion of the Justices No. 259, 373 So.2d 1050 (Ala.1979). Generally, the Justices make every effort to answer these questions. However, “expressions of opinions, hastily and abstractly considered, may well pose a greater danger of confusion and uncertainty than the exercise of judicial restraint in declining to respond to the question submitted.” Opinion of the Justices No. 280, 417 So.2d 936, 937 (Ala.1981). The opposite is likewise true, i.e., the failure to appropriately and completely answer a question propounded by a house of the Legislature may present an even greater danger where the legislation as to which the question is posed threatens vital constitutional principles.
“There is also an obligatory duty of the courts, which are vested with the power to pass upon the constitutionality of statutes, to not overlook or disregard constitutional demands, which the judges are sworn to support, and therefore, when it is clear that a statute transgresses the authority vested in the Legislature by the Constitution, it is the duty of the courts to declare the act unconstitutional, and from this duty they cannot shirk without violating their oaths of office.”
McCall v. Automatic Voting Mach. Corp., 236 Ala. 10, 13, 180 So. 695, 697 (1938). It is imperative for this Court to declare acts unconstitutional when the Legislature transgresses its constitutional authority; it is equally imperative for this Court to address the constitutionality of a bill as to which the Legislature requests an advisory opinion. It is axiomatic that proposed legislation cannot be based on an unconstitutional premise. “Undeniably, the legislature cannot enact a statute that conflicts with the Constitution, that is, that prohibits that which is permitted by the Constitution or that permits that which is prohibited by the Constitution.” City of Birmingham v. Graffeo, 551 So.2d 357, 361-62 (Ala.1989). Our review of S.B. 257 leads us to conclude that it wrongfully presupposes the constitutionality of certain “skill-dependent games” played upon “electronic, electrical, or mechanical equipment,” referred to in S.B. 257 as “game related equipment.”
The Senate sponsors seem to have relied upon Opinion of the Justices No. 358, 692 So.2d 107 (Ala.1997), in drafting S.B. 257. In that opinion, a majority of the Justices, giving an advisory opinion on House Bill *633 No. 160, opined that as long as “some degree of skill” is required in a gambling activity, that activity differs from a lottery in kind, rather than in degree, and thus, the Justices reasoned, H.B. 160 did not violate Alabama’s constitutional prohibitions against authorizing a lottery. Opinion of the Justices No. 358 went further to answer the question whether the use of certain equipment to play video poker instituted gambling by lot “if such equipment is designed and programmed to reflect correctly the rules of poker and the relative values and probabilities of the possible hands in poker.” 692 So.2d at 113. The Justices answered that it did not.
We believe Opinion of the Justices No. 358 has resulted in the very confusion and eiTor it expressly sought to avoid; therefore, this Court should clarify the law regarding the constitutional prohibition against lotteries and schemes in the nature of lotteries contained in § 65, Constitution of Alabama 1901, as it applies to S.B. 257. The failure to address and clarify this underlying constitutional question creates a great danger that local and state officials will similarly rely upon Opinion of the Jtistices No. 358 to the detriment of the citizens of this State.
We do not believe that under § 70 of the Alabama Constitution of 1901, S.B. 257 may originate in the Senate. To say that it may would mislead the members of the Alabama Legislature and the citizens of this State to believe that the underlying provisions of S.B. 257 are constitutional,[1] when they clearly are not. This Court should not avoid the question of the constitutionality of S.B. 257 under § 65 in an attempt to address only the precise and narrow question posed by the House of Representatives. This Court should never imply that a bill that it believes is unconstitutional can originate in either house of the Legislature. This Court should never, by silence, encourage the corruption and immorality[2] that § 65 was meant to prevent. For the reasons demonstrated in this advisory opinion, we reject the opinion expressed by a majority of the Justices in Opinion of the Justices No. 358. Because we consider S.B. 257 to be unconstitutional, that act cannot properly originate in either house of the Alabama Legislature.
I. Historical Analysis of Lotteries in America
In its infancy, the United States generally regarded lotteries favorably. Ronald J. Rychlak, Lotteries, Revenues and Social Costs: A Historical Examination of State-Sponsored Gambling, 34 B.C.L.Rev. 11, 12 (1992). This attitude was primarily attributable to the States’ weak tax base and decentralized government. 34 B.C.L.Rev. at 12. Lotteries eventually became so popular and prolific that one writer has noted: “By 1776, a lottery wheel existed ‘in every city and town large enough to boast of a courthouse and a jail.’ ” 34 B.C.L.Rev. at 27, citing Henry Chafetz, Play the Devil: A History of Gambling in the United States from H92 to 1955, at 25 (1960).
However, America’s infatuation with lotteries was relatively short-lived, because of widespread fraud and the related social problems. 34 B.C.L.Rev. at 13, 32. In 1825, Chief Justice Marshall, writing for the United States Supreme Court in Brent v. Davis, 23 U.S. 395, 402, 6 L.Ed. 350 (1825), referred to the policy of “tolerating lotteries” as “questionable.” Later, heavy opposition to lotteries began “as part of general social reform that included ... movements for ... peace, women’s rights, *634 educational reform, prison reform and abolition of slavery.” 34 B.C.L.Rev. at 32, citing Charles T. Clotfelter & Phillip J. Cook, Selling Hope: State Lotteries in America 36-37 (1989). In fact, in 1842, “Democrats [were] swept to power because of their opposition to lotteries.” 34 B.C.L.Rev. at 32, quoting National Institute of Law Enforcement and Criminal Justice, U.S. Department of Justice, The Development of the Law of Gambling: 1776-1976, at 269-70 (1977).
Describing the social problems attending lotteries, the librarian of Congress wrote that there existed “a general public conviction that lotteries are to be regarded, in direct proportion to their extension, as among the most dangerous and prolific sources of, human misery.” 34 B.C.L.Rev. at 12-13, citing A.R. Spoffard, Lotteries in American History, S. Misc. Doc. No. 57, 52d Cong., 2d Sess. 194-95 (1893) (Annual Report of the American Historical Society). In fact, the problems lotteries created were of such a magnitude and were so pervasive that by the late 1800s the States were nearly unanimous in imposing constitutional prohibitions on lotteries. 34 B.C.L.Rev. at 37. Against this backdrop, Alabama included a constitutional prohibition of lotteries in its Constitution of 1875. The 1901 Constitution adopted verbatim the 1875 Constitutional language. Section 65 of the Constitution of Alabama of 1901 now provides:
“The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery; and all acts, or parts of acts heretofore passed by the legislature of this state, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided.”
Since 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const., Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612.
According to Sir William Blackstone in his Commentaries on the Laws of England, the term “lottery” encompassed a broad array of activities:
“[A]ll private lotteries by tickets, cards, or dice ... are prohibited under a penalty ... for him that shall erect such lotteries.... Public lotteries, unless by authority of parliament, and all manner of ingenious devices, under the denomination of sales or otherwise, which in the end are equivalent to lotteries, were ... prohibited.... ”
4 William Blackstone, Commentaries on the Laws of England 173. Nevertheless, Alabama courts did not initially adopt such a broad definition. Buckalew v. State, 62 Ala. 334 (1878) (persons who wagered money on a round board and spun a hand fastened in the center in an attempt to register the highest number on the rim and thereby win money did not violate anti-lottery provisions). However, this narrow view was short-lived, and Alabama courts soon defined lotteries as Blackstone did, interpreting the term “lottery” broadly, thus prohibiting a wide variety of activities. See Reeves v. State, 105 Ala. 120, 17 So. 104 (1894) (persons paying for a privilege to spin an arrow located on a circular board for a chance to win an article of jewelry or a sum of money had engaged in a prohibited lottery); Loiseau v. State, 114 Ala. 34, 36, 22 So. 138, 139 (1897) (Court expressly modified Buckalew and held slot machine to be a lottery); Johnson v. State, 137 Ala. 101, 104, 34 So. 1018, 1019 (1903) (slot machine is a lottery); Try-Me Bottling Co. v. State, 235 Ala. 207, 211, 178 So. 231, 234 (1938) (the prohibition of lotteries *635 applies to any scheme in the nature of a lottery).
Despite this broad interpretation, the courts apparently lacked a consistent judicial standard for determining whether a scheme constituted a lottery. See Yellow-Stone Kit v. State, 88 Ala. 196, 198, 7 So. 388, 338 (1890) (provides numerous definitions for the term “lottery”), overruled by Grimes v. State, 235 Ala. 192, 178 So. 73 (1938), overruling recognized by Clark v. State, 262 Ala. 462, 80 So.2d 312 (1955). Consequently, in 1938, this Court provided the following definition of the term “lottery”: “(1) A prize, (2) awarded by chance, (3) for a consideration.” Grimes, 235 Ala. at 193, 178 So. at 74. This three-pronged definition of “lottery” was based on definitions of that term used by a vast number of authorities, both judicial and nonjudicial, and it is still accepted by the overwhelming majority of jurisdictions, as well as the United States Supreme Court.[3]
For many years, Alabama courts, when determining whether a gambling activity was an illegal lottery, focused primarily on the element of consideration. See Clark, 262 Ala. at 462, 80 So.2d at 312; Grimes, supra. However, more and more frequently, chance became the pivotal criterion in determining whether a game or scheme was constitutionally defined as a lottery and thus was prohibited. With the emergence of chance as the critical element, a working legal definition of that term became essential. “Chance” came to be defined as a lack of control over events or the absence of “controllable causation” — “the opposite of intention.” Black’s Law Dictionary 231 (6th ed.1990). While this definition of “chance” is generally accepted,[4] its judicial application remained uncertain because the element of chance in any situation is generally not a question of kind but of degree.
II. The English Rule versus the American Rule
Two dominant paradigms thus evolved concerning the role of chance in defining a lottery: the “English Rule” and the “American Rule.” Under the English Rule, only a scheme that exhibits or involves “pure chance” is a lottery. 34 Am.Jur. Lotteries § 6 (1941). As a result, a scheme involving any skill, no matter how de minimis, will not be classified as a lottery. Several Justices mistakenly expressed this view in Opinion of the Justices No. 258; however, the prevailing view in the United States is the “American Rule.” Under the American Rule, a scheme is a lottery if chance is the dominant factor in determining the result of the game, even though the result may be affected to some degree by skill or knowledge. 38 C.J. Lotteries § 5 (1925).
American courts have consistently rejected the English Rule. Most jurisdictions have embraced the American Rule. Bell Gardens Bicycle Club v. Department of Justice, 36 Cal.App.4th 717, 747, 42 Cal.Rptr.2d 730, 749 (1995) (“In determining whether a particular game or scheme is a lottery, the test in California is whether the game is dominated by chance, not whether the winner of the game is determined solely by chance.”); United States v. Marder, 48 F.3d 564, 569 (1st Cir.1995) (“for there to be a lottery, chance must predominate over skill in the results of the game”); Citation Bingo, Ltd. v. Otten, 121 N.M. 205, 207 n. 2, 910 P.2d 281, 283 n. 2 (1995) (“ ‘lottery’ is defined as ‘an enterprise’ ... wherein, for a consideration, the *636 participants are given an opportunity to win a prize, the award of which is determined by chance, even though accompanied by some skill”); Harris v. Missouri Gaming Comm’n, 869 S.W.2d 58, 62 (Mo.1994) (“a lottery is a form of gambling in which consideration is paid for an opportunity at a prize, where skill is absent or only nominally present”); Lashbrook v. State, 550 N.E.2d 772, 775 (Ind.Ct.App.1990) (“[cjhanee rather than skill must therefore be the dominant factor controlling the award in a lottery”); State v. Dahlk, 111 Wis.2d 287, 296, 330 N.W.2d 611, 617 (1983) (“[c]hance rather than skill must therefore be the dominant factor controlling the award in a lottery”); Roberts v. Communications Inv. Club of Woonsocket, 431 A.2d 1206, 1211 (R.I.1981) (“a scheme constitutes a lottery when an element of chance dominates the distribution of prizes, even though such a distribution is affected to some degree by the exercise of skill or judgment”); National Football League v. Governor of the State of Delaware, 435 F.Supp. 1372, 1385 (D.Del.1977) (“ ‘lottery’ should be interpreted to encompass not only games of pure chance but also games in which chance is the dominant determining factor”); Seattle Times Co. v. Tielsch, 80 Wash.2d 502, 507, 495 P.2d 1366, 1369 (1972) (“Chance within the lottery statute is one which dominates over skill or judgment.”); Johnson v. Phinney, 218 F.2d 303, 306 (5th Cir.1955) (“the authorities are in general agreement that if [chance] is present and predominates in the determination of a winner, the fact that players may exercise varying degrees of skill is immaterial; and the game or device is a lottery”); State v. Hudson, 128 W.Va. 655, 665, 37 S.E.2d 553, 558 (1946) (“where ... chance predominates, even though skill or judgment may enter to some extent in the operation of a particular scheme or device, the scheme or device is a lottery”); Commonwealth v. Lake, 317 Mass. 264, 267, 57 N.E.2d 923, 925 (1944) (“by the weight of authority a game is now considered a lottery if the element of chance predominates”); State ex rel. Dussault v. Kilburn, 111 Mont. 400, 404, 109 P.2d 1113, 1115 (1941) (“whether the element of skill predominated over the element of chance” determined whether game was a lottery); State ex Inf. McKittrick v. Globe-Democrat Pub. Co., 341 Mo. 862, 875, 110 S.W.2d 705, 713 (1937) (“a contest may be a lottery even though skill, judgment, or research enter thereinto in some degree, if chance in a larger degree determine the result”); Hotel Employees & Rest. Employees Int’l Union v. Davis, 21 Cal.4th 585, 592, 88 Cal.Rptr.2d 56, 981 P.2d 990, 996 (1999) (“ ‘Chance’ means that winning and losing depend on luck and fortune rather than, or at least more than, judgment and skill.”); In re Allen, 59 Cal.2d 5, 6, 27 Cal.Rptr. 168, 377 P.2d 280, 281 (1962) (“The test is not whether the game contains an element of chance or an element of skill but which of them is the dominating factor in determining the result of the game.”); Morrow v. State, 511 P.2d 127, 129 (Alaska 1973) (“We think that a game should be classified as one of skill or chance depending on the dominating element, not on the presence or absence of a small element of skill, which would validate the game under the pure chance doctrine.”); State v. Stroupe, 238 N.C. 34, 37, 76 S.E.2d 313, 316 (1953) (“most courts have reasoned that there are few games, if any, which consist purely of chance or skill, and that therefore a game of chance is one in which the element of chance predominates over the element of skill”).[5]
III. Opinion of the Justices No. 358
For many years, Alabama courts alluded to the divergent views on the issue of *637 chance. See Minges v. City of Birmingham, 251 Ala. 65, 69, 36 So.2d 93, 96 (1948) (contrasting the English Rule and the American Rule); Opinion of the Justices No. 83, 249 Ala. 516, 523, 31 So.2d 753, 760 (1947) (Lawson, J., writing specially and alluding to the “American Rule”). But it was not until 1997 that the Justices of this Court directly confronted the specific role of chance as it applied to the anti-lottery provision in the Alabama Constitution: “Resolution No. 63 requires us to consider the relationship between chance and skill as bearing on the ... element [of chance].” 692 So.2d at 110.
Before responding to the Legislature’s request, the Justices emphasized the difficulties in providing well-reasoned advisory opinions based upon conjecture of the sort requested:
“[T]he procedure by which this Court renders advisory opinions is fraught with difficulty. One of the problems is that ‘the opportunity is not generally available for opposing [persons] to present their respective positions.’ Another difficulty results from the fact that the requests come to us without a body of ‘pertinent facts ... as is usual in the adversary nature of our judicial system.’ ‘[Expressions of opinions, hastily and abstractly considered, may well pose a greater danger of confusion and uncertainty than the exercise of judicial restraint in declining to respond to the questions submitted.’ ...
“The abstractions with which we are often confronted when we consider requests for advisory opinions are particularly prominent in this request ....
[W]e are asked to consider the scope of § 65 in purely hypothetical contexts
692 So.2d at 110. (Citations omitted.) (Emphasis added.)
These warnings were appropriate. But despite the Justices’ stated concerns over rendering an opinion “without a body of pertinent facts,” and despite the Justices’ steadfast practice of abstaining from issuing opinions based upon hypothetical situations,[6] a majority of the Justices gave their opinion, stating that a game for consideration is constitutionally permissible, so long as merely “some degree of skill” is involved. 692 So.2d at 112. This conclusion would align Alabama with those few courts that have accepted the English Rule; it is rather perplexing, in light of Alabama’s long history of interpreting § 65 of the Alabama Constitution broadly.
In reaching their conclusion, a majority of the Justices prefaced their discussion of applicable law as follows: “Section 65 ‘merely says that the legislature shall not authorize a lottery.’ Therefore, our discussion necessarily focuses on the definition of that term.” Opinion of the Justices No. 358, 692 So.2d at 110 (citations omitted). Consequently, a majority of the Justices focused solely on the meaning of the term “lot,” explaining that when “the result of winning is to be determined by the use of a contrivance of chance, in which neither choice nor skill can exert any effect, it is gambling by lot, or a prohibited lottery.” 692 So.2d at 110-11, citing Loiseau, 114 Ala. at 38, 22 So. at 139. They also quoted Justice Lawson’s special writing in Opinion of the Justices No. 83, 249 *638 Ala. at 524, 31 So.2d at 761: “In a lottery the winner is determined by lot. Lot or chance is the determining factor.... ” Justice Lawson also stated that “in order for [a scheme] to be a lottery the result of winning or losing must be determined by chance, in which neither the •will nor. skill of man can operate to influence the result.” 249 Ala. at 522, 31 So.2d at 759. Finally, the Justices expressed their reliance upon Justice Livingston’s comments: “ ‘If merit or skill play any part in determining the distribution, there is no lottery.’ ” 692 So.2d at 111, quoting 249 Ala. at 525, 31 So.2d at 762 (Livingston, J., writing specially and quoting an American Jurisprudence annotation). These statements appear to imply that a game for consideration is constitutionally permissible if merely “some skill” is involved. However, these statements, taken in context, do not support the conclusion of Opinion of the Justices No. 358.
First, a majority of the Justices misconstrued the expansive nature of § 65 when they stated that “Section 65 ‘merely says that the legislature shall not authorize a lottery.’ ” 692 So.2d at 110. The Justices’ analysis was fundamentally flawed, because § 65 includes prohibitions against “gift enterprises” and “any scheme in the nature of a lottery.” This expansive language, which was not included in the Justices’ consideration, does not support Opinion No. 858’s narrow interpretation. Because the Justices based Opinion No. 858 on an unduly restrictive interpretation of the term “lottery,” considered in isolation from the other language of § 65, we cannot presume their conclusion is correct.
Second, Loiseau’s statement that “in order for [a scheme] to be a lottery the result of winning or losing must be determined by chance, in which neither the will nor skill of man can operate to influence the result,” 114 Ala. at 38, 22 So. at 139, was not nearly as broad or sweeping as suggested in Opinion No. 858. We agree that where consideration and a prize are present and -winning is determined by chance “in which neither ... choice nor skill can exert any effect,” the scheme is, of course, a lottery. However, Loiseau does not limit the restrictions of § 65 to games or schemes where skill or choice play no role. In fact, the issue in Loiseau “was not whether the prize was awarded by chance, but whether the element of a consideration was present.” 249 Ala. at 522, 31 So.2d at 759 (Lawson, J., writing specially).[7] Because the issue decided in Loiseau was not the degree of skill or chance necessary to determine whether the game was a lottery, the statements from that opinion relied upon by the Justices in Opinion No. 358 were, at best, dicta.
Similarly, the Justices’ reliance upon Justice Lawson’s writing in Opinion of the Justices No. 83, 249 Ala. at 522, 31 So.2d at 761, was misplaced. Although Justice Lawson opined that “to be a lottery the result of winning or losing must be determined by chance, in which neither the will nor skill of man can operate to influence the result,” his very next comment was that “[c]ertainly chance must be the dominant factor.” 249 Ala. at 522, 31 So.2d at 759 (emphasis added). He then favorably alluded to the American Rule in his comments:
“In a lottery the winner is determined by lot. Lot or chance is the determining factor and a participant has no opportunity to materially exercise his *639 reason, judgment, sagacity, or discretion .... Horse racing, like foot races, boat races, football, and baseball, is a game in which the skill and judgment of man enter into the outcome to a marked degree and is not a game where chance is the dominant factor.”
249 Ala. at 524, 31 So.2d at 761 (Lawson, J., writing specially). (Emphasis added.) This language demonstrates his adherence to the American Rule, i.e., the rule that a scheme is a lottery if chance is the dominant factor in determining the result of the game. 38 C.J. Lotteries § 5 (1925).
In Opinion of the Justices No. 205, 287 Ala. 334, 335, 251 So.2d 751, 753 (1971), the Justices adopted Justice Lawson’s opinion, stating that when a “significant degree of skill is involved,” a lottery is not present. (Emphasis added.) Thus, Justice Lawson’s opinion does not support the theory that a game for consideration is constitutionally permissible so long as “some skill” is involved. In fact, at no point in his opinion does Justice Lawson espouse that view. On the contrary, he supported “the correct American Rule,” i.e., that a game escapes anti-lottery provisions only where skill is the dominant factor. Therefore, if the Justices joining Opinion No. 358 had relied upon Justice Lawson’s view, instead of on isolated comments, they would have answered the question in a completely different way.
Finally, the Justices relied upon the following comments by Justice Livingston: “If merit or skill play any part in determining the distribution, there is no lottery.” 692 So.2d at 111, quoting 249 Ala. at 525, 31 So.2d at 762. The majority of the Court in 1997 interpreted this language, which was not part of the 1947 majority’s opinion, to mean that Justice Livingston considered a game for consideration to be constitutionally permissible as long as “some skill” is involved. Unfortunately, that interpretation was an incomplete representation of Justice Livingston’s view of lotteries. Justice Livingston’s remarks the very next year in Minges, 251 Ala. at 69, 36 So.2d at 96, clarified his position. Justice See, in his special writing in Opinion of the Justices No. 358, placed Justice Livingston’s comments in context:
“In fact, in Minges v. City of Birmingham, 251 Ala. 65, 69, 36 So.2d 93, 96 (1948), Justice Livingston, writing for this Court in an actual case, provided a more complete quote of the relevant passage from American Jurisprudence, as follows:
“ ‘In the United States, however, by what appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; that is sufficient if chance is the dominant or controlling factor.’ ”
692 So.2d at 114, n. 1 (See, J., writing specially). (Emphasis added by See, J.) Justice See concluded: “Thus, it appears that neither Justice Livingston nor the authors of the American Jurisprudence article would apply the English ‘any part’ test to determine whether a game for consideration is a ‘lottery’ in the United States.” 692 So.2d at 114, n. 1.
Moreover, the Justices joining Opinion No. 358 incorrectly stated: “Although the views of Justices Lawson and Livingston expressed in their special writings in Opinion No. 83 ... were not then shared by a majority of this Court, their views were accepted by a majority in Opinion of the Justices No. 205.” 692 So.2d at 111. (Citation omitted.) However, the Justices joining Opinion No. 205 did nothing more than adopt Justice Lawson and Justice Livingston’s view that pari-mutuel betting *640 on horse races and dog races did not constitute a lottery, because such activities involved significant amounts of skill, both on the part of the one betting and on the part of the participants. Opinion No. 205 went no further. As Justice See noted, Justice Livingston’s lone opinion, viewed in isolation — outside the context of the remainder of the American Jurisprudence article, upon which he relied — was not adopted by the Justices in Opinion No. 205.
Neither Loiseau, the special writings of Justice Lawson or Justice Livingston, nor the other references quoted in Opinion No. 358 support the conclusion that “any” degree of skill is sufficient to avoid the anti-lottery prohibition of the Alabama Constitution of 1901.
IV. The Rule of Law in Alabama
As stated previously, § 65 not only prohibits lotteries, but it also prohibits any “gift enterprise” or “scheme in the nature of a lottery.” “In this State, therefore, the public policy is emphatically declared against lotteries, or any scheme in the nature of a lottery, both by Constitution and by statutes.” (Emphasis added.) Try-Me Bottling Co., 235 Ala. at 212, 178 So. at 234.
“In Try-Me Bottling Co. ... this court expressly called attention to the broad conception set forth in § 65 showing that the prohibition is not only against lotteries but also against any scheme in the nature of a lottery. The very purpose of this broad declaration was to put a ban on any effort at evasion or subterfuge. Whatever may be the view of the courts of other states on the subject of lotteries, these cases show that this court has adopted a broad view of the meaning of the constitutional provision which does not admit of quibbling or narrow construction.”
Opinion No. 83, 249 Ala. at 518, 31 So.2d at 755. (Emphasis added.) Moreover, the fact that it was necessary to amend the Constitution to except “bingo” from § 65’s blanket prohibition on lotteries also demonstrates the broad construction that section has been given.
In 1981, the Justices of this Court, quoting Yellow-Stone Kit., 88 Ala. 196, 7 So. 338, stated: “ ‘[T]he courts have shown a general disposition to bring within the term “lottery” every species of gaming, involving a disposition of prizes by lot or chance, ... which comes within the mischief to be remedied — regarding always the substance and not the semblance of things, so as to prevent evasions of the law -” Opinion of the Justices No. 277, 397 So.2d 546, 547 (Ala.1981). (Emphasis added.) Indeed, the Constitution’s broad prohibition on all lotteries is evident because the Constitution explicitly condemns “any scheme” containing elements that would make the scheme resemble a lottery.
Alabama cases follow the American Rule. “Certainly chance must be the dominant factor.” Opinion of the Justices No. 83, 249 Ala. at 522, 31 So.2d at 759. (Emphasis added.) “In a lottery, ... chance is the determining factor and a participant has no opportunity to materially exercise his reason.... ” 249 Ala. at 524, 31 So.2d at 761. (Emphasis added.) A lottery is not present where “a significant degree of skill is involved.” Opinion of the Justices No. 205, 287 Ala. at 335, 251 So.2d at 753. (Emphasis added.) See also Minges, 251 Ala. at 69, 36 So.2d at 96, quoting 34 AmJur. § 6 (“In the United States, however, by what appears to be the weight of authority at the present day, it is not necessary that this element of chance be pure chance, but it may be accompanied by an element of calculation or even of certainty; that is sufficient if chance is the dominant or controlling factor.”).
It is clear that Alabama adheres to the American Rule, which is the rule of widest acceptance in the United States. That adherence is evidenced by prior rulings of this Court, as well as by reason and logic. As the cases cited above demonstrate, the vast majority of jurisdictions adheres to the American Rule: “The rule generally followed in the United States is that the *641 word ‘lottery’ includes those schemes wherein chance is the dominant factor in determining the result, although it may be affected to some degree by the exercise of skill or judgment.” 38 C.J. Lotteries § 5 (1925).
“A scheme is not a lottery if winning depends solely on skill or judgment. If elements both of skill and of chance are present in a plan, its character as a lottery generally depends on which is the dominant element. If the result of the distribution is to be determined solely by skill or judgment, the scheme is not a lottery, even though the result is uncertain or may be affected by things unforseen and accidental. Where elements both of skill and of chance enter into a contest, the determination of its character as a lottery or not is generally held to depend on which is the dominating element.... [I]t is generally held that the mere fact that some skill is involved in the game is insufficient to save it from being a lottery, and that the word ‘lottery’ includes those schemes wherein chance is the dominant factor in determining the result, although it may be affected to some degree by the exercise of skill or judgment.”
54 C.J.S. Lotteries § 4 (1987).
Moreover, logic dictates a similar result. The English Rule is subject to abuse and misuse, ' because many unquestionably chance-based games, such as guessing contests, roulette wheels, or slot machines might not be classified as lotteries under the English Rule. Mathematicians, engineers, physical scientists, or others familiar with scientific calculations might be considered more “skilled” at using the “laws of probability” to predict a particular outcome. A guess by someone educated in any discipline still, in its essence, remains a guess. Under the English Rule, any educated guess may be considered sufficient to preclude the contest in which the guess is made from being considered a lottery.[8]
In 1997, in Opinion No. 358, Justice See, joined by Justice Maddox, stated in his separate writing: “I do not agree with the other Justices’ conclusion ... that a game for consideration is constitutionally permissible as long as merely ‘some skill is involved.’ ” 692 So.2d at 113. Justice See and Justice Maddox thus recognized that the English Rule does not apply in Alabama.
The better definition is that where the dominant factor in a participant’s failure or success in any particular game or scheme is chance, the scheme is a lottery — despite the use of some degree of judgment or skill. Therefore, in Alabama the American Rule controls, and even if skill is present, it is the question whether chance dominates that determines whether a lottery exists. It is for the courts to determine, on a case-by-case basis, whether skill or chance dominates in an activity and, therefore, whether the activity is in the nature of a lottery. As this Court has repeatedly made clear, § 65 does not prohibit the Legislature from authorizing gambling. Opinion of the Justices No. 205, 287 Ala. at 335, 251 So.2d at 753. Indeed the Legislature has done so. Ala. Code 1975, § 13A-12-20 et seq. But it is emphatically the role of the courts to determine the constitutionality of an act or activity, and that role requires the courts to determine whether the act or activity constitutes a lottery.
V. Video-Amusement Machines
In the typical video-gambling game, a player inserts money into an “amusement *642 machine” in order to begin play. Ronald J. Rychlak, Video Gambling Devices, 37 UCLA L.Rev. 555, 567 (1990). The player then wagers his credits or money upon the game. 37 UCLA L.Rev. at 567. A machine may allow the player to make choices, e.g., in the case of video poker, whether to discard a number of selected cards. 37 UCLA L.Rev. at 567. Based on the results of the play, a player will then win or lose credits. 37 UCLA L.Rev. at 567. Frequently, the player redeems remaining credits for prizes, which may include merchandise or certificates of monetary value. 37 UCLA L.Rev. at 567. If a prize is awarded for such consideration and chance predominates in determining the outcome, then the activity would be in the nature of a lottery, whether the activity is a video machine in a small convenience store or is a video machine in an elaborate gambling establishment.
On most video-amusement machines, there is also a preset payout percentage programmed into the machine itself. 37 UCLA L.Rev. at 567. S.B. 257 itself addresses this programming:
“A racing operator holding a supplemental license shall be permitted to program game related equipment to provide such a payback to the players of such equipment as it shall deem suitable for its business, provided that no such equipment shall be programmed to give players a theoretical cumulative payback of less than 80 percent or more than 99 percent of the money wagered over continuous play, ... assuming that the skill dependent game played on such equipment is being played by a player with the optimum skill level.”
Section 2.7, S.B. 257. Thus, no amount of skill will ever determine the ultimate out-cóme of a video game allowed by S.B. 257, and the programmed gaming device will, “over continuous play,” always prevail. In other words, even the most skilled player will, over time, be unsuccessful in winning more money than he or she has wagered.[9] The North Carolina Court of Appeals, confronted with a similar situation, held that such a provision removed even the remotest element of skill, making video games illegal slot machines: “[Although a player’s knowledge of statistical probabilities can maximize his winnings in the short term, ... [i]n the long run, the video game’s program, which allows only a predetermined number of winning hands, negates even this limited skill element.” Collins Coin Music Co. v. North Carolina Alcoholic Beverage Control Comm’n, 117 N.C.App. 405, 409, 451 S.E.2d 306, 308 (1994) (citation omitted).
Not surprisingly, courts of other jurisdictions have found such video machines to be games dominated by chance. Score Family Fun Ctr., Inc. v. County of San Diego, 225 Cal.App.3d 1217, 275 Cal.Rptr. 358 (1990) (Mini-Boy 7, offering video games of blackjack, poker, hi-lo, double-up, and craps — among others — offered games dominated by chance); United States v. Marder, 48 F.3d 564 (1st Cir.1995) (chance dominated over skill in playing video-amusement game); Games Mgmt., Inc. v. Owens, 233 Kan. 444, 662 P.2d 260 (1983) (small amount of skill required to play video poker and video blackjack was overshadowed by pure chance); Garono v. State, 37 Ohio St.3d 171, 524 N.E.2d 496 (1988) (video-gaming machines are games of chance); H & Z Vending v. Iowa Dep’t of Inspections & Appeals, 593 N.W.2d 168 (Iowa Ct.App.1999) (“fraternal poker” was a game of chance).
*643 Moreover, the fundamental nature of such games is chance — a player’s skill, no matter how good or bad, does not and cannot control the randomness inherent in the “deal” of the cards. Stated another way, the skill of the player may increase the player’s odds of winning but ultimately the player’s skill cannot determine the outcome, regardless of the degree of skill involved. Chance, being the nature or outcome-determining factor of the game, dominates over skill.
Several Justices have previously found that horse races and dog races were gambling activities subject to regulation by the Legislature, but that they were not lotteries within the purview of § 65. These Justices pointed to the presence of objective criteria, such as the condition, speed, and endurance of a horse, as well as the skill and management of the rider. Opinion No. 205, 287 Ala. at 335, 251 So.2d at 753. They noted the presence of other objective factors, such as “weight, paternity, trainer, position, past record, wet or dry track, etc.” Opinion No. 205, 287 Ala. at 335, 251 So.2d at 753. These video games apparently provide no objective factors for evaluation. They always lack the human interaction critical in the exercise of an objective analysis. Players face a preprogrammed computer, the nature of which is unknown. In a video game of cards, the player cannot inspect the deck, have the cards reshuffled, request a new deck, or evaluate the “dealer.”

Conclusion

Section 65 of the Constitution of Alabama of 1901, in prohibiting a lottery or “any scheme in the nature of a lottery,” was intended to provide a broad proscription of the evils suffered by earlier generations who, after experiencing the effects firsthand, found lotteries to be “among the most dangerous and prolific sources of human misery.” 34 B.C.L.Rev. at 12-13, citing A.R. Spoffard, Lotteries in American History, S. Misc. Doc. No. 57, 52d Cong., 2d Sess. 194-95 (1893) (Annual Report of the American Historical Society). Most American courts, and indeed the courts of Alabama, have long recognized the “American Rule,” which labels as a lottery an activity in which a prize is awarded by chance and for consideration, when chance is the dominant element, even when a degree of skill may affect the outcome. We unequivocally reject the “English Rule,” which would permit any activity where a prize is awarded by chance for a consideration, and in which some degree of skill is present, to escape the anti-lottery provision of § 65 of the Alabama Constitution.
It is difficult to conceive of any situation where video games of the kind described in S.B. 257 would not be considered a lottery under § 65, because there are no objective and ascertainable criteria a player can use that would demonstrate the exercise of any material skill. But we specifically find that video games of the sort described in S.B. 257 are unconstitutional because chance is the dominant factor in those games, and no amount of skill will ever determine the outcome of a video game where the machine is programmed to win. S.B. 257 would not meet the test for either the American Rule or the English Rule. We reach this conclusion based not on hypotheticals, but upon the certain language and specific requirements of S.B. 257 itself.
The question before this Court concerns a specific bill, which on its face defines and regulates video games in such a way as to violate the anti-lottery provision of § 65 of the Constitution of Alabama of 1901. Because “the legislature cannot enact a statute that conflicts with the Constitution,” Graffeo, 551 So.2d at 361, S.B. 257 may not originate in either house of the Legislature. We cannot be so derelict in our duties as to ignore the fact that S.B. *644 257 is unconstitutional, when the safety and welfare of the public are at stake, but we must support and defend the Constitution we are sworn to uphold.
QUESTION ANSWERED.
Respectfully submitted,
/s/ Roy S. Moore Chief Justice
/s/ Harold See * Associate Justice
/s/ Jean Brown Associate Justice
/s/ Lyn Stuart Associate Justice
Members of the House of Representatives
Alabama State House
Montgomery, Alabama
Dear Representatives:
We have received House Resolution No. 251, by which you request the opinion of the Justices whether Senate Bill No. 257 is a bill for raising revenue which must originate in the House of Representatives under Article IV, Section 70, of the Constitution of Alabama of 1901.
Your resolution reads:
“BE IT RESOLVED BY THE HOUSE OF REPRESENTATIVES OF THE LEGISLATURE OF ALABAMA, That we respectfully request the Honorable Chief Justice and Associate Justices of the Supreme Court or a majority of them, to give this body their _ written opinions on the following important constitutional question which has arisen concerning the pending bill, Senate Bill 257, a copy of which is attached to this resolution and made a part hereof by reference.
“By way of background, Senate Bill 257 provides that bona fide coin-operated amusement machines shall not be subject to the criminal prohibition against possessing a gambling device. It further authorizes each racing commission in Alabama to license each racing facility to conduct skill dependent wagering games and levies certain state and local license taxes on the conduct of the skill dependent games.
“Section 70 of the Constitution of Alabama of 1901, provides in pertinent part: ‘All bills for raising revenue shall originate in the House of Representativés.’
“In view of Section 70 of the Constitution, an important constitutional question has arisen concerning legislative action on Senate Bill 257. Accordingly, pursuant to Section 12-2-10 of the Code of Alabama 1975, and in deference to this legislative body, so that we may properly and constitutionally dispatch the duties of our office, written opinions are respectfully requested concerning the following important constitutional question:
“Is Senate Bill 257 a revenue raising measure which needs to originate in the House of Representatives?”
The preamble to Senate Bill 257 states the bill’s purposes:
“To add certain defined terms to the state’s gambling laws and modify other defined terms now included in such laws; to make legislative findings regarding the purpose of this act; to provide that bona fide coin-operated amusement machines shall not be subject to the criminal prohibition against possessing gambling devices; to amend the exemption of racing facilities from existing gambling laws in order to accommodate other licensed wagering activities at such facilities; to authorize each racing commission in the state to license each racing facility under its jurisdiction to con *645 duct skill dependent wagering games; to prescribe the terms and conditions of such license; to define certain terms in connection with the authorization, licen-sure, regulation, and taxation of skill dependent games; to confer upon each racing commission, in addition to the powers that it has to license and regulate racing and pari-mutuel wagering thereon, the same or similar powers to license and regulate the conduct of skill dependent wagering games; to exempt skill dependent wagering games from the prohibitions of certain criminal and civil statutes; to provide that certain acts related to skill dependent wagering games shall constitute crimes; to levy certain state and local license taxes on the conduct of skill dependent wagering games; to provide for the disbursement of the state taxes; to provide that the provisions of the act shall be severable; and to prescribe the effective date of various provisions of this act.” (Emphasis added).
Sections 2.9 and 2.10 of Senate Bill 257 levy state and local license taxes, respectively, on the conduct of skill dependent games by a racing operator:
“Setetion 2.9.
“(a) A state license tax on the conduct of skill dependent games by a racing operator is hereby levied in an amount equal to 10 percent of the game revenue derived from such games, which tax for each calendar month shall be paid to the Alabama Department of Revenue by each racing operator on or before the twentieth day of the next succeeding calendar month. At all times while the taxable condition shall be in effect, the state license tax, levied pursuant to this section, shall be the only business license tax levied by the state.
“(b) The Alabama Department of Revenue shall have the same power to make regulations respecting the reporting, collection, and enforcement of the state license tax as it has with respect to the pari-mutuel pool tax levied by Chapter 26A of Title 40 of the Code of Alabama 1975, with necessary and appropriate changes to reflect the different nature of the state license tax. The proceeds of the state license tax shall be paid into the Education Trust Fund.
“Section 2.10. There is hereby levied a local or commission license tax on the conduct of skill dependent games by a racing operator equal to five percent of the game revenue derived from such games, which tax for each calendar month shall be paid to the racing commission on or before the end of the next succeeding calendar month. The expenses of each racing commission in licensing and regulating skill dependent games under this act shall be paid out of the proceeds of the commission license tax collected by such commission. The net proceeds of the commission license tax collected by each racing commission, after deducting its licensing and regulatory expenses, shall be held in escrow and, pending the disbursement thereof, shall be invested in obligations in which municipalities of the state are authorized to invest their surplus funds, until a local act, or general act of local application, pertaining to the county in which such racing commission exercises its jurisdiction shall be enacted by the Legislature to provide for the disbursement of such proceeds. The commission license tax shall be the only business license tax levied by any county, municipality, racing commission, or other local taxing authority upon the conduct of skill dependent games.” (Emphasis added.)
Article IV, Section 70 of the Alabama Constitution of 1901, reads:
“All bills for raising revenue shall originate in the house of representa- *646 Uves. The governor, auditor, and attorney-general shall, before each regular session of the legislature, prepare a general revenue bill to be submitted to the legislature, for its information, and the secretary of state shall have printed for the use of the legislature a sufficient number of copies of the bill so prepared, which the governor shall transmit to the house of representatives as soon as organized, to be used or dealt with as that house may elect. The senate may propose amendments to revenue bills. No revenue bill shall be passed during the last five days of the session.” (Emphasis added).-
Therefore the question is whether Senate Bill 257 is a bill for “raising revenue” as that term is used in the first sentence of Section 70. This Court has previously explained Section 70 in an Opinion of the Justices:
“The last clause [of section 70] has been held to apply exclusively to bills in the nature of general revenue bills. [Citations omitted.]
“The first clause, however, is not so restrictive and the meaning accorded that clause is that any bill ‘to levy a tax, as a means of collecting revenue’ is a bill for raising revenue within its terms. Perry County v. Selma, M. & M.R. Co., 58 Ala. 546, 557 [1877]. This interpretation was accorded the clause in Re Opinions of the Justices, 238 Ala. 289, 290, 190 So. 824, 825 [1939], where it was stated that ‘Any bill * * * whose chief purpose is to create revenue, or to increase or decrease revenue * * * is one to raise revenue and must originate in the House of Representatives under the first sentence in Section 70 of the Constitution.’
[[Image here]]
“This first clause of the constitutional section has been held not to apply to bills which brought into play the exercise of the police power of the state and raising revenue was an incidental purpose thereto. Beeland Wholesale Co. v. Kaufman, 234 Ala. 249, 174 So. 516 [1937]; Houston County v. Covington, 233 Ala. 606, 172 So. 882 [1937]; In re Opinions of the Justices, 223 Ala. 369, 136 So. 589 [1931]; Kennamer v. State, 150 Ala. 74, 43 So. 482 [1907]. It is perhaps well to observe that the act dealt with in the Kennamer case and those considered in 233 Alabama [233 Ala. 463, 172 So. 661 (1937)] and 223 Alabama, supra, were held not merely to raise revenue but to require those deriving special benefits to bear those heavier burdens and was within the police power of the state.... ”
Opinion of the Justices No. 181, 259 Ala. 514, 516, 66 So.2d 921, 923 (1953). See Opinion of the Justices No. 218, 357 So.2d 331, 333 (Ala.1978); Opinion of the Justices No. 324, 511 So.2d 505, 513 (Ala.1987). Thus, “raising revenue” as the term is used in Section 70 is levying a tax. However, when a bill brings into play the exercise of the police power of the State, and the levying of a tax is an incidental purpose, it is not necessary that the bill originate in the House. Dearborn v. Johnson, 234 Ala. 84, 87, 173 So. 864 (1937).
Senate Bill 257 provides for the licensing and regulation of skill dependent wagering games at racing facilities. While the bill levies taxes on the conduct of skill dependent games by racing operators, it requires the racing operators themselves to pay the license taxes based upon percentages of their revenue from such • games. The regulation of gambling devices is within the police power of the State. See State ex rel. Chen v. One 5¢ Fifth Inning Base Ball Machine, 241 Ala. 455, 3 So.2d 27 (1941). Senate Bill 257 brings into play the exercise of the police power, and the levying of taxes is merely *647 incidental to the other purposes of the bill; thus, Senate Bill 257 is not a revenue raising measure under Section 70.
Following the settled law in this State, we answer your question in the negative.
Respectfully submitted,
/s/ J. Gorman Houston, Jr.
/s/ Robert Bernard Harwood, Jr.
/s/ Thomas A. Woodall Associate Justices
Members of the House of Representatives
Alabama State House
Montgomery, Alabama
Dear Representatives:
I agree with Chief Justice Moore, Justice Brown, and Justice Stuart, that Senate Bill 257, if enacted as it now reads, would violate Art. IV, § 65, of the Constitution of Alabama of 1901. Because S.B. 257 is unconstitutional, it is irrelevant whether it should have originated in the House of Representatives instead of the Senate.
I write separately because I have previously been asked for, and given, my opinion on the meaning of § 65. In Opinion of the Justices No. 358, 692 So.2d 107 (Ala. 1997), the members of the Alabama Senate asked the Justices of this Court to provide their opinions on whether a pending bill, if enacted, would violate the ban on lotteries imposed by § 65. Seven members of this Court expressed the opinion that the constitutional ban on lotteries did not prohibit gambling if the game involved “some degree of skill.”[1] 692 So.2d at 112. I disagreed.
I wrote in Opinion of the Justices No. 358 that § 65 “require[s] that a game for consideration possess a material skill component, that is, a genuinely significant and meaningful skill component, to avoid being classified as a lottery.” 692 So.2d at 114. I am the only Justice now serving on this Court who expressed that opinion. Because I have been asked for, and have given, my opinion on that question, I do not reach the'question whether it is appropriate to offer an answer to a question not asked. S.B. 257 includes this statement:
“The Legislature hereby finds and determines that the laws of the state relating to gambling need to be amended in various respects to recognize the distinction between skill dependent games and other games or contests of chance where the outcome is purely dependent upon chance without being affected to any degree by the skill of the players.... ”
Section 1.1(b), S.B. 257, 2001 Regular Session. (Emphasis added.) The Bill is premised on the theory that games that include “any” degree of skill meet the Constitutional standard of Art. IV, § 65. I rejected that theory in my writing in Opinion of the Justices No. 358. To answer that the unconstitutional bill may or must originate in one house or the other would imply that my understanding of Art. IV, § 65, has changed. It has not.
Respectfully submitted,
/s/ Harold See Associate Justice
Members of the House of Representatives
Alabama State House
Montgomery, Alabama
*648 Dear Representatives:
By resolution of March 15, 2001, you have requested an advisory opinion pursuant to § 12-2-10, Ala.Code 1975, concerning Senate Bill 257, a bill dealing with coin-operated amusement machines. Your question is whether S.B. 257 is a revenue-raising measure that should originate in the House of Representatives.
Under a long-prevailing view, the provisions of § 12-2-10 have been considered as privileging — but not requiring — the individual Justices of this Court to give advisory opinions. See Opinion of the Justices No. 274, 394 So.2d 957 (Ala.1981). I consider my options to include the following:
(1) to answer your inquiry by expressing an opinion only as to the precise question asked, thereby providing a basis for speculation as to whether I have at least tacitly approved the views expressed in an earlier advisory opinion by certain Justices, not including the undersigned, who were then members of this Court.[1]
(2) to exercise my previously noted privilege to decline to answer the question.
I elect the second option; therefore, I respectfully decline to answer the question.
Respectfully submitted,
/s/ Champ Lyons, Jr. Associate Justice
The Honorable Members of the Alabama House of Representatives
Alabama State House
Montgomery, Alabama 36130
Dear Members of the House:
I respectfully decline the request of House Resolution 251 for an advisory opinion on Senate Bill 257 of the 2001 Regular Session.
Respectfully submitted,
/s/ Douglas Inge Johnstone Associate Justice

. In fact, we question whether the Legislature would even have proposed S.B. 257 had not a majority of the Justices in 1997 issued an advisory opinion that, in our opinion, incorrectly interpreted the anti-lottery provision of § 65, Ala. Const. 1901.

. State v. Crayton, 344 So.2d 771 (Ala.Civ.App.1977); State v. Shugart, 138 Ala. 86, 35 So. 28 (1903).

. Black’s Law Dictionary (5th ed.1979) succinctly defines "lottery” to mean "a chance for a prize for a price.” Nevertheless, concerning the role of chance, consulting dictionaries often proves unfruitful because most dictionaries ascribe both narrow and broad meanings to the term.

. Contact Inc. v. State, 212 Neb. 584, 587, 324 N.W.2d 804, 806 (1982); State v. Koo, 647 P.2d 889, 892 (Okla.Crim.App.1982); People v. Shira, 62 Cal.App.3d 442, 462, 133 Cal.Rptr. 94, 105(1976); De Witt Motor Co. v. Bodnark, 169 N.E.2d 660, 666 (Ct. Com. Pl., Summit Co., Ohio 1960); Minges v. City of Birmingham, 251 Ala. 65, 69, 36 So.2d 93, 96 (1948).

. While anti-lottery provisions may differ, the rule of law applied to each remains the same, i.e., if chance is dominant, then the game is a lottery and is prohibited.

. "The second question is also an improper subject for an advisory opinion because it is a hypothetical question....” Opinion of the Justices No. 308, 449 So.2d 239, 240 (Ala.1984). "We are of the opinion that the statute does not authorize the expression of opinions on hypothetical questions.” Opinion of the Justices No. 162, 267 Ala. 110, 113, 100 So.2d 565, 567 (1958). The question now presented does not, however, request an opinion based on hypotheticals. Rather, our consideration is based on the specific provisions of S.B. 257 currently pending before the Legislature.

. In fact, Justice Lawson correctly noted that this Court had never considered the role of chance in a lottery. “In none of [the cases of this Court dealing with gambling] has the court been called upon to pass on the question as to whether or not a lottery was shown to exist where the element of skill entered into the determination of the winner.” 249 Ala. at 522, 31 So.2d at 759 (Lawson, J., writing specially).

. Justice See, in his special writing in Opinion No. 358, also demonstrated the fallacy of the English Rule. "[A] game simulating a roulette wheel, if labelled a 'skill dependent game,' and if it allowed the bettor to start and stop the wheel, might pass the [English Rule], but would probably fail the ‘material exercise’ test [the American Rule].” 692 So.2d at 114.

. Ironically, a purchaser of a single Georgia State Lottery ticket will receive better odds of winning that lottery than he will of winning "over continuous play” against a video machine regulated by S.B. 257. The chance of winning "over continuous play” against a video machine permitted by S.B. 257 is zero percent.

 See the separate opinion of Justice See.

. See Opinion of the Justices No. 358, 692 So.2d 107 (Ala.1997) (dealing with specific questions concerning the constitutionality, under the Lottery Clause [§ 65 of the Alabama Constitution of 1901], of a bill permitting any racetrack in this state to conduct skill-dependent wagering games for profit through the use of video-display electronic equipment).

. Those Justices wrote:
''[W]e think it is the exercise of some degree of skill that is the sine qua non of compliance with the constitution.... In other words, as long as some degree of skill is required in a gambling activity, that activity differs from a lottery in kind, rather than in degree. In such a case the issue is not the degree of skill involved, but whether some skill is involved."
692 So.2d at 112.